[Crim. No. 13274. In Bank. Apr. 5, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN SOMMERHALDER, Defendant and Appellant.

292

---

**COUNSEL**

Archibald M. Mull, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward P. O'Brien, Robert R. Granucci and Sanford Svetcov, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**THE COURT.**—John Sommerhalder and Kenneth Preston were jointly charged on February 15, 1968, with the murders of Curtis and Shirley Ackley on January 12, 1968, in the County of Marin. Each pleaded not guilty. Separate jury trials resulted in conviction of murder in the first degree on two counts and imposition of death sentences. Separate appeals have been automatically filed.

At the jointly held preliminary hearing on February 1, 1968, the public and press were excluded at the request of Sommerhalder. The court ordered the transcript sealed to all but the defendants, defense counsel, prosecution and trial judge. At the 995 hearing[1] at which suppression of evidence was argued on March 6 the public and press were excluded and the superior court continued in effect the previous order restricting examination of transcripts. Defense motions to suppress, to sever and for change of venue were denied on May 3, but severance was granted on May 13 after the court was furnished with copies of incriminating statements made by each of the accused which the prosecution stated it intended to offer at the trial.[2]

The Preston trial commenced on May 14, 1968, Sommerhalder having consented to being tried last and to a continuance for this purpose. On June 29 the jury returned its verdicts. On July 2 Sommerhalder filed a motion for change of venue, urging that because of the publicity during the trial in the San Rafael Independent Journal and over local radio station KTIM he could not receive a fair trial in Marin County. The motion was denied. The motion was unsuccessfully renewed prior to and after *voir dire* of prospective jurors. No application was made for a writ of mandate at any time. On September 19 the jury returned its verdicts and in the penalty proceedings fixed the penalty at death. Motions for new trial and for reduction of penalties to life imprisonment were denied. Judgment was pronounced November 22, 1968.

The principal issues on this appeal are whether Sommerhalder received a fair trial by an impartial jury, uninfluenced by pretrial publicity; whether

---

[1] Penal Code section 995 (cases in which indictment or information must be set aside).

[2] See *People* v. *Aranda* (1965) 63 Cal.2d 518, 523-527 [47 Cal.Rptr. 353, 407 P.2d 265]. In the Sommerhalder trial no statements of Preston, incriminating or otherwise, were introduced although testimony as to his presence on critical occasions was in evidence. In the Preston trial extrajudicial out-of-custody statements allegedly made by Sommerhalder incriminating both himself and Preston were admitted as "adoptive admissions." (See *People* v. *Preston, infra,* p. 308 [107 Cal.Rptr. 300, 508 P.2d 300].)

evidence at the residence where Sommerhalder was arrested was seized as the result of lawful entry and search; and issues relating to the death penalty (alleged *Witherspoon* errors) (*Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]), instructions in the penalty phase, constitutionality of the penalty. No issue is raised as to the sufficiency of the evidence to support the verdicts nor as to the instruction given that the evidence was such that either the defendant was innocent of the charge of murder or he was guilty of murder in the first degree. There was no evidence introduced of diminished capacity.

There were no eyewitnesses. The evidence was circumstantial. Viewing the evidence in the light most favorable to the People, as we must on appeal, we conclude that the first degree murder convictions of Sommerhalder can be sustained on the theory of (1) wilful, deliberate and premeditated killings or of (2) killings which were committed in the perpetration or attempted perpetration of burglary, robbery or rape. (Pen. Code, § 189; *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208].) ■ The criminal agency causing death may be proved by circumstantial evidence and the reasonable inferences to be drawn therefrom. (*People* v. *Miller* (1969) 71 Cal.2d 459, 477 [78 Cal. Rptr. 449, 455 P.2d 377].)

*Facts:* The murder victims were Curtis (age 28) and his wife Shirley (age 34) Ackley. They operated a barber shop in Terra Linda in Marin County and lived in a trailer house located about a mile distant. They were last seen alive about 10 p.m. on Friday, January 12, 1968, at a local restaurant. They were found dead in their trailer the following morning. Shirley had been strangled, stabbed, shot and apparently raped. Curtis had been shot. The trailer had been ransacked.

The Ackleys had each arrived in separate cars at the restaurant on Friday evening. Curtis left about 10 minutes before Shirley. When they did not show up at the barber shop by 9 a.m. the next morning, a customer, Mr. Albert Bailey, became concerned and asked for directions to their home. He went to the trailer, saw both cars parked nearby but no one answered his knock. The door was locked and the curtains were drawn. He returned to the barber shop and came back with another person. Fearing that the Ackleys might have become asphyxiated Bailey reached through a louver window, shoved the draperies aside, and looked in. He saw Shirley's nude body sprawled on the floor and sent for the sheriff.

Curtis was found lying on the bedroom floor, fully clothed, face down, wedged between the bed and the bathroom door. His hands and feet were

taped behind him. He had been shot four times in a two-inch area just be-hind his left ear through a towel, which was still wrapped around his head, and a pillow which was lying nearby. There were powder stains and bullet holes in the pillow. Parts of four .32 caliber bullets were recovered from his brain. The autopsy surgeon testified that death resulted from the bullet wounds. The Ackley dog was found locked inside the bathroom.

Shirley was lying on her back in the living room with her legs spread apart and her breasts exposed, her bra having been torn between the cups and the pieces laid back across her arms. There was adhesive tape across her eyes. Some of her clothing was on the sofa. Her coat was lying adjacent to her left hip and slightly underneath her knee. The coat had a hole in the back and blood stains near the collar. She had apparently been shot while she had her coat on. A bullet entered her neck and exited near the shoulder. This would not have caused death or unconsciousness.

Shirley's blouse, which was wrapped around her head, had a bullet exit hole in the left shoulder area and two slits in the back from stab wounds. She had two deep knife wounds in her back, and a 6-inch blade hunting knife was still imbedded in one wound. She was apparently near death when stabbed.

She had been shot just below her left ear and a .32 caliber bullet was recovered from her brain. This could have caused death. A pillow lying near her body had a powder pattern on one side and a bullet hole. An unexpended bullet was found in a freshly made hole in the wall near the sofa.

A deep U-shaped indentation on Shirley's neck indicated that she had been strangled, and this could have caused death. Pieces of a broken dog leash were on her neck and an electric cord, yanked from a lamp found on the sofa, was still tightly wrapped around her neck. She also had two lacerations on her forehead which penetrated to the skull bone. Near her feet was a green shag rug. A multicolored wall to wall rug covered the trailer. Sections of these rugs were taken for microscopic examination of fibers.

The position of Shirley's body indicated that she had possibly been the victim of a sexual assault. Examination revealed semen and sperm over the external labia in her pubic area and a large number of sperm in her vagina. In the doctor's opinion the sperm was most likely deposited there within 24 hours of her death, and could have been deposited between

10:30 and 11 p.m. that evening. Time of death for each victim was fixed at between 7 p.m. and 3 a.m. Curtis apparently died first as his body showed a greater degree of rigor mortis.

The deaths were unquestionably due to a criminal agency or agencies. No identifiable fingerprints of suspects were found.

John Sommerhalder was seen while he was driving north on Highway 101 near Novato in his blue and white Thunderbird car about 11 p.m. that Friday night by two witnesses who knew him. The witnesses, who were also in a car proceeding north along that highway, observed that there was a single passenger in the Thunderbird, that he had light blond hair and was about the same height as Sommerhalder. They could not otherwise identify the passenger.

Kenneth Preston at that time had long blond hair and was a close companion of Sommerhalder. He was 21, Sommerhalder 25. They were both members of the Grim Reapers Motorcycle Club of Santa Rosa, of which Sommerhalder was president. Preston was at that time living in a room which he rented from Ronald Long, another member of the club, in a cabin Long had rented located at 840 Butler Avenue, Santa Rosa. Long arrived at this place about midnight on Friday with a companion, Thomas Caswell. He found the door locked. When he knocked Sommerhalder opened it but told him to get rid of Caswell before coming inside as "we have something going." Sommerhalder's Thunderbird was parked next to the front door.

When Long entered he noticed some new guns lying in the living room. He went to his room but came out when he smelled smoke coming from Preston's room. He found Preston and Sommerhalder burning papers in a metal pot. When he objected they took the pot and its contents outside and then returned. Sommerhalder had blood on his right arm. He told Long that he and Preston had been playing with a gun and it accidentally went off. At Sommerhalder's request Long cut out the bullet with an exacto blade, poured bourbon over the wound, drilled a hole in the bullet and put it on a chain, giving the chain and bullet to Sommerhalder. It was a .38 caliber slug.

Long also noticed that at that time Sommerhalder was wearing a .357 western type pistol in a holster and an ammunition belt, and that there were new guns, knives and a crossbow in Preston's bedroom. Earlier that day Long had lent Preston a .38 caliber double action revolver, which at that time had five shells and one empty chamber, and had also given him

a handful of cartridges. Preston returned this gun to him at this time, with one additional empty shell in it. There was a gunrack on the wall with rifles. There were quite a few knives—hunting knives, machetes, and daggers.

Long testified that Sommerhalder told him at that time that "we were burglarizing the Ackley trailer and they came home," that a gun went off and then they had to kill the man, that the woman was "hard to kill," that they used a knife and a gun, and they got about $225 cash.

Richard Sommerhalder, 21-year-old brother of Sommerhalder, testified that Suzanne Mulkey (Shirley's daughter by a prior marriage, and a former schoolmate of his) had told him, in front of others, about her stepfather's gun and coin collection in the trailer house. On Thursday, January 11, without her knowledge, Richard and Steve Tannahill had gone to the Ackley trailer about 1 p.m. and had burglarized it. They saw many guns but took only one, a .32 Smith and Wesson, unloaded, with "333" as the last of the serial numbers on it. They also took $40 from a coin collection. They divided the coins. Richard gave the .32 to Sommerhalder when he returned to Santa Rosa that day.

On the morning of Friday the 12th Suzanne Mulkey visited her mother, both at the barber shop and in the trailer house, and was alone in the trailer part of the day. She took some money, and the pot in which it was stored. She frequently took money and things from her mother's trailer. She left the dog loose inside the trailer, locked the door, returned the keys to the barbershop, and was back in Santa Rosa by 7 p.m. She was living there with her father and stepmother. She went to the service station in Santa Rosa where Sommerhalder worked about 7 p.m. and saw' him, Preston, Steve and Richard there. Sommerhalder and Preston counted the coins in the pot she gave them and Sommerhalder gave her a roll of bills in exchange. Suzanne, Richard, Steve and another girl then went to a drive-in theater, returning home early the next morning, Saturday the 13th.

On Saturday afternoon about 1 p.m. Sommerhalder called Suzanne at her home stating "in a funny voice" that he had to talk to her. Richard arrived a few minutes later, telephoned Sommerhalder at the number given to Suzanne, received directions how to get to 840 Butler Avenue and was told to bring Suzanne there. Neither had been to that address before. When they arrived they saw Sommerhalder's car by the front door. He admitted them and took them to Preston's room, a small room about eight by ten feet with few furnishings. The room was small enough that

Richard could hear the conversation, although he did not pay attention to all of it. Both Richard and Suzanne testified as to the conversation.

Sommerhalder said that he had bad news for Suzanne, that they had broken into the trailer, had everything just about out when her parents walked in, that it would have been all right if "they" had not seen "Kraut" (Preston), that there was a panic, somebody had a half-cocked gun and it went off and there was some shooting, and that it was "either them or us." He said that someone had been shot, but did not say who. He told them "None of us are going to say a word and if it gets out we will know who it was by," that if anybody found out there would be more grief, more trouble, more killing, something would happen, someone would go to the gas chamber, or words to that effect. Both Suzanne and Richard felt frightened by these remarks and considered them threats.

Sommerhalder also intimated that there were other persons present in the trailer but stated that Suzanne did not need to know as there were "too many people involved." He further stated "I couldn't do it. Kenneth and I couldn't do it. We had to leave the room. The other two did it. We had to have the other two do it. We were in the back room."

Richard and Suzanne each noticed in the room a crossbow which belonged to her stepfather. Richard also noticed an assortment of handguns and about ten highpowered rifles. There was a gun near him on a dresser, and another, a .38, loaded, which was on a little stool. After the middle of the conversation he stayed within reaching distance of this gun. They remained about 20 minutes. Suzanne was crying when they left. They drove around the rest of the evening with Steve. When they returned to her father's house that evening they were all three arrested on suspicion of murder. Richard and Suzanne were interrogated by officers from Marin County and Sonoma County until about 3 a.m. Sunday the 14th. They separately related the statements made to them that afternoon by Sommerhalder. Richard described some of the things he had seen at the Butler Street house. The officers were otherwise informed that Shirley had expressed some fear of the Sommerhalder brothers, Richard and John.

*Arrest and Search.*

About 4 a.m. on Sunday, January 14, eight peace officers from the two counties went to 840 Butler to question the occupants, Long and Preston, and John Sommerhalder, who they had reason to believe was staying there, with regard to the killings and articles missing from the Ackley trailer. They had no warrant for arrest or search but their stated purpose was to pursue their ongoing investigation in performance of their duties.

The reliability of their informants was unproved but this did not affect their duty to investigate.

When the officers arrived at 840 Butler there were no lights showing but the Thunderbird was still parked by the front door. Inspector Kenneth Irving knocked on the door, a series of raps, twice and shouted "Sheriff's Office, open up." Officer Baird also called out "Sheriff's office." There was no verbal response but they heard movement inside like someone scurrying around. Immediately after the second series of raps and announcement there came a response—three or four shots were fired in rapid succession from inside the house through the front door splintering the door jamb. One bullet passed between Inspectors Irving and Shine, who were standing in front of the door with Baird to one side, and a splinter of wood from the door grazed Irving's skin near the eye.

Almost instantaneously with the sound of the shots Shine pushed Irving to one side and kicked at the door, damaging it. The prosecution evidence was conflicting as to whether it was kicked open but the defense evidence was that it was not kicked open. Long testified that he opened it when they surrendered. Shine testified that after twice making a series of knocks on the door sufficient "to awaken anybody that might be sleeping inside . . . the shots were fired, there was great excitement, we knew the shots came from inside the house because we did not know what to expect when we got to the residence. We didn't know if anyone was there or how many people were there or what to expect once we got there, so the shooting was the last thing that was expected. I think the shots excited me which [*sic*] I kicked the door open, pushed Inspector Irving aside. . . ."

Immediately after the shots the officers retreated to positions behind the patrol cars in front of the house. Sergeant Wiley, stationed at the rear of the building, fired a volley from a submachine gun into the nonoccupant part of the house, toward the inside but below floor level. The officers again called out to the occupants. Someone yelled out "We surrender. We quit. We'll come out." Long opened the door and he, Sommerhalder, Preston, and Caswell emerged. They were arrested on the spot for assault with a deadly weapon and for suspicion of homicide. Long told the officers he thought they were a rival gang he was expecting.[3]

The officers then entered the house through the open door. They made no further announcement of their presence or entry. They found no

---

[3]Long testified for the defense that he was fearful of an attack from another bike club, had barricaded the house and planted a bomb in front of the house, was sitting with a loaded weapon in the hall when the police knocked, and that he shot at the door thinking it was the anticipated attackers.

persons inside. They made a search and seized items, some of which were in plain sight, which belonged to the Ackleys.

The murder weapon was found in a dresser drawer in Preston's room —a .32 caliber break open revolver with the serial number "261333," which proved to be the weapon which Richard had stolen from the trailer and given to Sommerhalder the night before the murder. The Ackley crossbow was found on the floor in Preston's room. Shirley's suitcase was in the hallway outside Preston's room. It was filled with coins from the Ackley coin collection, Shirley's jewelry and Curtis' watch collection. Guns, knives, holster, and ammunition belt belonging to the Ackleys were found in plain sight. The .38 bullet removed from Sommerhalder's arm by Long the day after the murders could have been fired from one of the two Colt revolvers found in this search.

Subsequent examination of the clothing of the arrested persons revealed distinctive fibers from either or both the throw rug or floor rug in the trailer on the clothing of Sommerhalder and Preston, but none on the clothing of Long and Caswell.

Five days later, on January 19, search was made by Inspectors Shine and Bradford, after obtaining permission from the owner of 840 Butler, of an open 50-gallon drum used as an incinerator. It was located in the front yard of the residence, was visible from the road, and was not fenced off. There appeared to have been quite a bit of burning in the can. They found ashes and cartridge shells surfaced to the top. They prodded with a stick through the top of the ashes and turned up, near the surface, a card with the name "Shirley Howard" (Shirley's name before she was married). There were also metal frames of purses and remnants of jewelry boxes, with the cloth burned off, and a box of spent cartridges.

Richard Penry, who had been at 840 Butler when Suzanne and Richard arrived and talked with Sommerhalder and Preston in the latter's room on Saturday afternoon, testified that he saw her crying when she left. He also testified that on Saturday morning he saw the two defendants burning trash in this incinerator. He and another person had just left the house Sunday morning a few minutes before the police arrived. He had also noticed new guns in the house. He said there were always guns around but they were moved around a lot from room to room, and didn't stay in the same place.

*The Defense.*

An alibi witness testified that she had talked with Preston at the Butler residence at approximately the same time that Sommerhalder and his blond

passenger were seen on the highway near Novato. Sommerhalder testified. He denied his involvement in these crimes; he admitted calling Suzanne and telling her that her parents had been killed; he denied, or did not recall, making any admissions to Suzanne or his brother Richard; he admitted receiving the .32 caliber gun (murder weapon) from Richard Thursday night but stated he had given it to a person, whom he would not name, on Friday morning; stated that he had learned of the Ackley killings, from a person he would not identify, at 840 Butler; and he equivocated with respect to any bullet wound in his arm. He was sleeping on a mat in the front room at the Butler residence when the officers arrived and did not hear their announcement. He admitted being on parole for a prior felony conviction of assault with a deadly weapon.

### Asserted Error in Denying Motions for Change of Venue.

Sommerhalder made four pretrial motions for change of venue pursuant to section 1033 of the Penal Code based on the ground of prejudicial pretrial publicity.[4] All of the motions were made after the decision of this court in *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372]. The record indicates acute awareness of the court and of all counsel of the principles there enunciated for evaluating such motions, and awareness of the availability of pretrial appellate review, by mandamus, after denial of such motions. No such review was sought.

■ Failure to seek pretrial relief by mandamus in no way limits the traditional right of a defendant to have the denial of his motion for change of venue reviewed on appeal from his conviction, but the scope of review has changed since *Maine.* ■ It is now the duty of the reviewing court to make an independent evaluation of the circumstances which defendant claims resulted in denying him a "fair and impartial trial" within the meaning of section 1033. (*People* v. *Hathcock* (1973) 8 Cal.3d 599, 618-620 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Welch* (1972) 8 Cal.3d 106, 112-114 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Salas* (1972) 7 Cal.3d 812, 817-819 [103 Cal.Rptr. 431, 500 P.2d 7]; *People* v. *O'Brien* (1969) 71 Cal.2d 394, 399-401 [78 Cal.Rptr. 202, 79 Cal.Rptr. 313, 456 P.2d 969].) ■ Our independent review of the evidence indicates that defendant received a fair and impartial trial under the standard of "reasonable likelihood" set forth in *Maine.*

At the hearing held May 3, 1968, on motion of both defendants, most of the newspaper articles in evidence concerned themselves with the

---

[4]Penal Code section 1033 requires the court to order a change of venue (a) on motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.

unavailability of news because of the restrictive action taken by the court. When severance was granted Sommerhalder consented to being tried last. After the Preston trial was concluded Sommerhalder again moved for change of venue. This was heard on July 11 and 19, 1968. In evidence were some 28 newspaper articles, all under the same byline and published in the Independent Journal during the period May 14 through July 1, 1968, reporting the nature of the crimes charged, the names of both accused, the evidence produced at the Preston trial, arguments made by counsel and rulings made by the court. Many of the articles included references to Sommerhalder, some included incriminating statements attributed to him, and there were some articles which might have been considered inflamatory.

Also in evidence at that hearing were affidavits signed by eight attorneys, each of whom alleged that he practiced law primarily before the courts of the County of Marin, and stated, generally, that there was reasonable likelihood that a fair trial could not be had because of the local publicity which had included Sommerhalder's name. The circulation manager of the Independent Journal gave evidence as to the county-wide circulation of his paper. However, he had no personal opinion as to whether Sommerhalder could or could not get a fair trial by reason of the articles published in his paper, and no opinion poll had been conducted to see how many of its readers had followed the Preston trial. The president and general manager of radio station KTIM testified that it was their policy to use local news developed by the Independent Journal; that the use thereof was left to the discretion of the broadcasters; that no copies were kept of what had been aired; that he believed the Preston case was aired to some extent; and that if Sommerhalder's name was printed it would be read that way over the air. However, he had not personally followed the Preston case in the newspaper; he was not knowledgeable about it; he did listen to the morning and afternoon radio newscasts, on which local crime news was stressed; generally he listened to crime newscasts; he could not recall anything about the Preston trial and he thought he must not have been interested in it.

The People presented evidence that the two San Francisco papers had a daily circulation in Marin County similar to that of the Independent Journal but they had merely printed brief items at the start and closing of the trial. The murders had occurred during a newspaper strike. Investigators from the district attorney's office testified as to a personal opinion survey made by them of 100 residents randomly selected at several

shopping centers located in various parts of the county immediately preceding the hearings on this motion.[5]

The court commented upon its own experience in listening to *voir dire* of prospective jurors in other cases, stating its view that the community memory seemed to be rather short. It stated that in *another* criminal case, in which there had been a highly publicized four-week trial on the issue of guilt, veniremen who were *voir dired* thereafter for the penalty trial stated that they had not heard of that defendant. It denied the motion.

No new evidence was offered at the hearing on the third pretrial motion for change of venue held six weeks after the conclusion of the Preston trial. The defense now charges that at that hearing the court did not actually read the newspaper articles submitted on the former motion and resubmitted on this motion. However, the defense had one court hearing on that evidence and it sought no appellate review of either decision.

*Voir dire* lasted less than two days for the examination of some 59 prospective veniremen. Neither side used all of its available 20 peremptory challenges (Pen. Code, § 1070)—the prosecution using 18, the defense only 15. In *People* v. *Tidwell* (1970) 3 Cal.3d 62, 67 [89 Cal.Rptr. 44, 473 P.2d 748], relied upon by defendant, *Tidwell* had exhausted all of his peremptory challenges, was still left with a hostile jury, and pretrial appellate review had not then been authorized. Here the defense was well aware of *Maine* and the reasons stated therein for seeking relief prior to trial, but it accepted a jury with five unused peremptory challenges and did not seek appellate review.

Immediately after the selection of the jury panel, the court met in chambers, outside the presence of the jury, to reconsider the motion for change of venue in the light of their responses on *voir dire*. The court stated that it had listened very attentively, that it was satisfied no further evidence had been developed, and that it would deny the motion. Defense

---

[5]The questionnaire showed these results:

1. Have you heard of Mr. and Mrs. Curtis Ackley? Yes, 43; No, 57.
2. Have you heard of John Sommerhalder? Yes, 40; No, 60.
3. Have you heard of Kenneth Preston? Yes, 47; No, 53.
4. Have you read or heard anything in the news media concerning the trial of Kenneth Preston for murder occurring on January 12 in Marin County? Yes, 21; No, 46; blank, 33.
4a. Have you formed an opinion concerning the guilt or innocence of John Sommerhalder? Yes, 12; No, 45; blank 41, undecided 1.
4b. If you were chosen as a trial juror could you give John Sommerhalder a fair and impartial trial uninfluenced by anything you may have read or heard? Yes, 53; No, 9; blank, 37; undecided, 2.

counsel indicated he might renew the motion the next morning. He did not do so and the trial proceeded.

Transcript of the *voir dire* does not support the defense claim that it was denied a fair and impartial panel of jurors. The victims were not shown to have been well known or popular members of the community, the jurors were not shown to have been acquainted with witnesses or to have hostility toward the accused. ■ We take judicial notice of the fact that Marin County was not a small rural community. In 1968 it had 204,800 population, ranking 18th of California's 58 counties in population, and adjoins a large metropolitan area. (See *Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 373 [66 Cal.Rptr. 710, 438 P.2d 358].)

A prospective juror who patronized the Ackley barber shop was dismissed for cause, as was a prospective juror who knew one of the witnesses. Also dismissed for cause were two prospective jurors who had read or knew about the case and had formed an opinion about it. Of the jury and alternates selected, some had read about the case, some recalled reading the name Sommerhalder, none had followed the case in any detail, and each stated he had no present opinion regarding the guilt or innocence of the defendant.[6] ■ The trial court concluded that "so far as their sworn statements are concerned" there was no one either on the jury, or either alternate, who indicated any bias or prejudice developed through reading the newspaper accounts. None had listened to the radio newscasts. We find nothing in the record to persuade us to the contrary.

Some veniremen were examined who had been called but excused from serving on the Preston panel. Two of these were accepted as jurors in the present case. Mrs. Wanda Ilchert stated she had read about the case but after being excused as a Preston juror she had gone out of town and had not read anything until the last article on that trial; she had discussed it only with her husband but they had not discussed guilt or innocence; she could not recall who was supposed to have done what; and she formed no opinion then, and held none now, as to the guilt or innocence of anyone. Mr. Zigomar Pistochiny had read some early headlines, did not recall the name of either defendant, and did not follow the Preston trial. As above indicated, the defense had unexercised peremptory challenges when it accepted these persons as jurors.

---

[6]Penal Code section 1076 provides that in a challenge for implied bias "no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter . . . *provided,* it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him."

*Entry and Search of the Butler Street Residence.*

When the officers went to 840 Butler Street at 4 a.m. on Sunday morning they had just completed interrogation of Mrs. Ackley's daughter Suzanne and her friend Richard Sommerhalder. They had reason to believe the occupants had some knowledge of the Ackley deaths and that they had possession of articles taken from the Ackley trailer. They had a duty to make an investigation as quickly as possible. They went for the lawful purpose of making an investigation of the occupants of the house. They had reason to believe there was an arsenal of guns and weapons in the house. They had no way of knowing how many persons might then be inside the house, or whether the persons they had to question were still there.[7]

When they arrived they saw Sommerhalder's car parked by the front door. ▓▓▓ They substantially complied with the "knock and announce" provisions of Penal Code section 844. They were immediately fired upon through the door. In view of this response it was not necessary for them to announce the purpose for which they desired admittance (see *Duke* v. *Superior Court* (1969) 1 Cal.3d 314 [82 Cal.Rptr. 348, 461 P.2d 628]). They could then have entered with force, if need be, to make an arrest or arrests for assault upon them with a deadly weapon. They chose a more prudent course, retreated to positions of safety, fired into a non-occupant part of the house, and again called out for the occupants to surrender. The occupants then surrendered. Although four persons came out, including the three whom the officers wanted to question, the officers had reasonable cause to believe that there might be others inside, either armed or wounded, and they had a duty to find out. (See *People* v. *Block* (1971) 6 Cal.3d 239, 242-245 [103 Cal.Rptr. 281, 499 P.2d 961].) It was not necessary for them under the circumstances to again "knock and announce" after the noisy gun battle which followed their first announcement.

Search of the premises was conducted prior to the decision in *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], and is governed by the less stringent pre-*Chimel* rules (*Williams* v. *United States* (1971) 401 U.S. 646 [28 L.Ed.2d 388, 91 S.Ct. 1148]; *United States* v. *Rabinowitz* (1950) 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430]). "*Rabinowitz* recognized that 'What is a reasonable search is not to be

---

[7]Although not then known to the officers, people had been coming and going from the house prior to the arrival of the officers, including Sommerhalder. Two persons left just 15 minutes before the officers arrived. The occupants, anticipating an attack by a rival motorcycle gang, had wired a homemade bomb to the front yard and had erected barricades inside the house.

determined by any fixed formula' and that 'The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case' (339 U.S. 56, 63 [94 L.Ed. 653, 659])." (*People* v. *Medina* (1972) 7 Cal.3d 30, 36-37 [101 Cal.Rptr. 521, 496 P.2d 433].) ■ In justifying the particular intrusion upon the constitutionally protected interests of the private citizen, there must be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" (*Terry* v. *Ohio* (1968) 392 U.S. 1, 20-21 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868]).

The burden is upon the prosecution in this regard. (*McDonald* v. *United States* (1948) 335 U.S. 451, 455-456 [93 L.Ed. 153, 158-159, 69 S.Ct. 191].) A showing was made that it was only fortuitous that the *place* of arrest was outside the house. ■ The officers had justifiable grounds to enter the house to make an arrest or, in the interest of their own safety, to require the occupants to come out with their hands up. There were articulable reasons for the officers to conclude that specific evidence relating to the crime would be found inside the house, that the house contained an arsenal of weapons, including loaded guns, and that there might be other persons inside who could pose a threat to the safety of the officers outside or to the safekeeping of the evidence. "[I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties" (*Terry* v. *Ohio, supra,* 392 U.S. 1, 23-24 [20 L.Ed.2d 889, 907]; *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 829 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]).

The search was made incident to and at the same time as the lawful arrest. Exigent circumstances were shown. The house was in a rural area, outside the city limits. The arrest was made in the early morning hours. There were only eight officers and four arrestees, and there was a possibility that other armed persons might be arriving (i.e., the rival gang expected by Long). It was necessary to transport the arrested persons as quickly as possible to more secure custody. There was a practical probability, of which we may take judicial notice, that at that hour and place there might be limited law enforcement reserves to call upon for assistance while procuring a search warrant; and it was necessary to obtain or safeguard evidence as part of the arrest.

There was no general exploratory search. The officers were looking for specific articles taken from the Ackley trailer which they had articulable reason to believe were in the Butler Street house. Some of the evidence seized was in plain sight. The murder weapon, a .22 revolver with the serial number ending in "333," was found inside a closed drawer in

Preston's room. However, there was sufficient other circumstantial evidence connecting Sommerhalder with the possession of such a gun that it could be considered cumulative evidence.

The trial court held that all of the arsenal seized was admissible in evidence, that if these persons kept an arsenal in the house, were on the premises at the time of the arrest, and part was taken from this source, that the whole arsenal was relevant to show the kind of people the defendants were, that they kept themselves armed to the teeth, and that the jury could properly draw such inferences. However, the only weapons introduced into evidence were those connected up with the defendants.

■ The subsequent search of the open trash can was made with the permission of the owner of the premises. Spent bullet shells were found near the surface. The evidence there found was cumulative to the overwhelming evidence already found.

The remaining issues revolve around the constitutionality of the death penalty imposed pursuant to Penal Code section 190, and the selection of the penalty jury. Under the authority of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], and *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the death penalty imposed herein upon defendant is unconstitutional and the judgment appealed from must be modified to provide for sentences of life imprisonment rather than death. It is not necessary, therefore, to respond to defendant's contention that he was prejudiced in the selection of the penalty jury. (*People* v. *Hathcock, supra,* 8 Cal.3d 599, 621-622.)

The judgment is modified to provide for a sentence of life imprisonment and as so modified is affirmed.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment. (See Cal. Const., art. I, § 27.)