[S.F. No. 23758. May 23, 1979.]

LEROY ELDRIDGE CLEAVER, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[S.F. No. 23759. May 23, 1979.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
LEROY ELDRIDGE CLEAVER, Real Party in Interest.

298

## COUNSEL

John W. Keker, Kipperman, Shawn, Keker & Brockett and Marcus S. Topel for Petitioner in No. 23758 and Real Party in Interest in No. 23759.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Sanford Svetcov, Deputy Attorneys General, for Petitioner in No. 23759 and Real Party in Interest in No. 23758.

No appearance for Respondent.

## OPINION

**RICHARDSON, J.**—Defendant Eldridge Cleaver was charged, in an indictment returned by the Alameda County Grand Jury in 1968, with three counts of attempted murder (Pen. Code, § 187), and three counts of assault with a deadly weapon upon police officers (*id.,* § 245, subd. (b)). Subsequent to his indictment, defendant moved to suppress certain evidence pursuant to Penal Code section 1538.5. After hearing evidence and argument, the trial court granted the motion to suppress as to some of the items challenged. but denied it as to others, Both the defendant and the People seek writs of mandate, and we must now determine, on the basis of the following undisputed facts, which of the challenged items, if any, must be suppressed.

### THE BASEMENT SEARCHES

The charges against defendant arose from an alleged shootout between Oakland police officers and persons associated with the Black Panther

Party. At approximately 9 p.m. on April 6, 1968, Officers Darnell and Jensen, while on patrol in the vicinity of 2095 Union Street, Oakland, California, were fired upon unexpectedly by several assailants who fled on foot. Both officers were wounded, and a lengthy gun battle ensued as other Oakland officers were summoned to the scene.

Six of defendant Cleaver's codefendants were arrested, and defendant and his companion, Bobby Hutton, sought refuge in the basement of the residence at 1218 28th Street in Oakland. The residence was owned and occupied by Nellie Pierre, who for her safety was carried from the house by police officers during the 90-minute period while the officers laid seige to the basement where the two suspects were cornered. At approximately 11 p.m. a tear gas cannister set the building afire driving defendant and Hutton from the basement. Hutton was fatally shot when he exited the building, and Cleaver was arrested.

When police technicians McCurdy and Hussey arrived at the scene following defendant's arrest, at about 11:30 p.m., the area had already been cordoned off and sealed. McCurdy learned from his fellow officers that gunfire had been exchanged with individuals in the basement, that the basement had caught fire from tear gas cannisters, and that one of the suspects had been killed in front of the building. As the firemen were putting out the fire McCurdy and Hussey, wearing gas masks, entered the basement. Although they were able to ascertain that no persons remained in the basement, the large quantity of tear gas prevented necessary visibility and they left the basement to wait for the fumes, gas, and smoke to subside.

At 2 a.m. McCurdy reentered the basement when the gas had partly cleared. It was stipulated that the reentry was made "primarily" to look for physical evidence, and the officer saw, photographed and seized a partially burned automatic rifle. The lingering tear gas remained quite strong and McCurdy's eyes were watering and burning. During the 2 a.m. search, McCurdy also saw and removed a live tear gas cannister, which was thereupon placed in a bomb removal container and later disposed of by a bomb squad at the Oakland airport. McCurdy also removed a few spent cartridge casings as well as some live .223 caliber shells.

Since they had not yet been able to conduct a thorough search because of continued impaired visibility, McCurdy and Hussey secured the area, sealed it off with an officer on guard, and resumed their other duties.

Later, about 7 a.m., Sergeant Reed arrived and was assigned to search the basement for any evidence which had not been seen or found during the night. About 8 a.m. he entered the basement. There were still approximately three inches of water on the floor and the basement was wholly charred and dirty with rubble everywhere. The air remained smoky with a residue of tear gas. The officer observed a sleeve or collar of a jacket protruding above the murky, opaque water. He also recovered two other jackets, live and expended ammunition and other miscellaneous items in the jacket pockets, as well as pocket cartridge belts.

The People acknowledge that no search warrant was obtained for any of the entries or searches of the basement, and defendant forcefully challenges their constitutional propriety.

In determining the admissibility of the items seized during the basement searches, we apply well established principles. The Fourth Amendment to the federal Constitution and article I, section 13, of the California Constitution equally guarantee "The right of the people to be secure in their persons, houses, papers, and effects" against unreasonable searches and seizures. ■ We have said that a search within the meaning of these constitutional provisions occurs whenever a person's reasonable expectation of privacy is violated by governmental intrusion. (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1100-1104 [80 Cal.Rptr. 633, 458 P.2d 713].) It is further settled that, in the absence of one of a number of carefully circumscribed exceptions, such a search is per se unreasonable if it is not conducted pursuant to a valid search warrant. (*Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408]; *People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130], and cases cited therein.)

■ One of the recognized exceptions to the warrant requirements arises when "exigent" circumstances justify the conduct of a warrantless search. In amplifying this principle in *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], we stated: "In this context, 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect *or destruction of evidence*. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (Italics added.)

■ Defendant concedes that the officers' initial entry at 11:30 p.m. was valid, on the basis of exigent circumstances which existed at that time. Defendant, however, asserts that any exigency had ceased to exist by the time the succeeding 2 a.m. and 8 a.m. searches were conducted. To the contrary, as we will demonstrate, there exist several bases on which to support a holding that these later searches were proper continuations of the initial warrantless search which was frustrated by the heavy quantity of gas, smoke and fumes. Since the officers had a conceded right to conduct a full and complete inspection of the basement at 11:30 p.m., we conclude that the subsequent searches of those same premises, occurring within a reasonable time thereafter and based upon a continued state of exigent circumstances, were reasonable under the foregoing constitutional provisions.

A very similar factual situation was recently presented to the United States Supreme Court in *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942]. The high court in *Tyler* upheld a warrantless police search of a building conducted seven hours after firemen had extinguished the flames and a fire chief had entered the premises seeking evidence of arson. The court reasoned that the later police entry was a "continuation" of the initial entry and was undertaken within "a reasonable time" thereafter. The fire chief arrived at the scene of a fire at 2 a.m., just as the fire department was "watering down smoldering embers" on the premises. (P. 501 [56 L.Ed.2d at p. 493].) Upon being informed that several containers of flammable liquid had been found in the building, the chief entered the premises without a warrant, examined the containers and, concluding that the "fire could possibly have been an arson" (p. 502 [56 L.Ed.2d at p. 493]), called the police.

A police detective arrived at the scene of the fire at 3:30 a.m., approximately an hour and a half after the smoldering embers of the fire had been extinguished. He entered the building similarly without a warrant and examined the premises for evidence of arson. While in the building the detective took several pictures of the containers and of the interior of the building and seized the containers, but "finally abandoned his efforts because of the smoke and steam." (*Ibid.* [56 L.Ed.2d at p. 493].) By 4 a.m., the fire having been entirely extinguished, both the fireman and the police detective left the scene. At 9 a.m., when the smoke and steam had cleared from the building and daylight rendered a search of the premises safer and more informative, the police detective and fire chief returned to the scene, reentered the premises, again without a warrant, and gathered additional evidence that was ultimately introduced at the defendant's arson trial.

The lower court in *Tyler,* while agreeing that a burning building constituted a sufficient exigency to render a warrantless entry reasonable and constitutional, nonetheless held that "the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame." (*Id.,* at p. 510 [56 L.Ed.2d at p. 498].) The Supreme Court, however, rejected such a characterization of the exigencies of the circumstances as "unrealistically narrow," explaining: "Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. *Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction.* And, of course, the sooner the officials complete their duties, the less will be the subsequent interference with the privacy and recovery efforts of the victims." (*Ibid.* [56 L.Ed.2d at pp. 498-499], italics added.)

The high court explained: "For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." (*Ibid.* [56 L.Ed.2d at p. 499].) Moreover, the court also concluded that the "exigent circumstances" justifying an immediate warrantless search of the scene of a fire similarly justified the continuation of the search in that case during the later morning hours, despite the failure of the officers to obtain a warrant.

The court reasoned: "On the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries [the following day]. As the fire was being extinguished, Chief See and his assistants began their investigation, *but visibility was severely hindered by darkness, steam and smoke.* Thus they departed at 4 a.m. and returned shortly after daylight to continue their investigation. Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that the morning entries were *no more than an actual continuation* of the first and the lack of a warrant thus did not invalidate the resulting seizure of evidence." (*Id.,* at p. 511 [56 L.Ed.2d at p. 499], italics added.)

As the dissent herein observes, the high court did invalidate a subsequent evidentiary search conducted *several weeks* after the fire had occurred. Contrary to the dissent, however, this subsequent search was not held invalid because it was solely aimed at gathering evidence, but because it occurred long after any exigency had passed. As the *Tyler* court explained, "The entries occurring after January 22, however, were clearly

detached from the initial exigency and warrantless entry." (*Ibid.* [561 L.Ed.2d at p. 499].)

The *Tyler* rationale is fully applicable to the present case. The 11:30 p.m. search was thwarted by residual smoke, fumes and tear gas. The relatively short delays until 2 a.m. and 8 a.m., necessitated by darkness and continuing impaired visibility, cannot be deemed constitutionally improper or unreasonable under all the circumstances in this case. These circumstances, all of which were known to the officers conducting the two challenged searches, included the following: Two police officers had been wounded in an ambush, and a violent gun battle had ensued. Defendant Cleaver's colleague had been killed in an exchange of gunfire with the police. The subject building had been set on fire by exploding tear gas cannisters; dangerous weapons, explosives and ammunition might have remained inside. The number of assailants, whether they were armed, their then location and identities were all unknown; the basement might have contained evidence leading to the immediate apprehension of remaining suspects. In short, the situation was a tense, volatile and serious business full of uncertainty and confusion. Considering the hour, place and general circumstances, the delayed entries, caused by the officers' physical inability to conduct a thorough search, were constitutionally permissible.

As in *Tyler,* the 2 a.m. and 8 a.m. entries were justified by the need to preserve evidence threatened with destruction by fire or water in the basement. Having been fired upon from the basement and having flushed out their assailants by the use of tear gas, it was reasonable for the officers to believe that the basement may have contained evidence identifying their attackers, or containing contraband such as illegal guns or other weapons. The building had been partially burned. Water damage obviously was heavy. The initial 11:30 p.m. entry was aborted because of the officers' inability to see. Any papers or records in the basement could have been burned or rendered illegible by the water. Wooden or plastic materials could have been burned or been in danger of obliteration, and in fact the automatic rifle which was seized during the 2 a.m. search had already been partially burned. Similarly, ammunition belts or containers as well as live ammuniton may well have been in danger of burning or exploding. In our view, in combination, these physical circumstances created an exigency fully justifying the warrantless entries.

Furthermore, because the basement itself was partially burned, the very safety of the building and its contents was threatened. The fire was

caused by exploding tear gas cannisters which were lobbed into the basement by the police. The continuing threat to the building amply justified a reentry to determine if the fire was continuing or if other threats to the building existed.

Defendant argues that the officers' stated reason for the reentry was to search for evidence, rather than to protect the building or its contents.

First of all, as we have explained above, a warrantless search to preserve evidence from possible destruction is entirely proper if conducted under exigent circumstances. Second, the record herein shows only that the "primary" reason was a search for evidence. Obviously, there existed other reasons relating to the general safety of the premises and its contents which had been subject to substantial fire and water damage. The 2 a.m. inspection was well rewarded for the police did, in actuality, find a live tear gas cannister of the type which had initially set fire to the building. We think it reasonable to conclude that it remained a threat. It was removed, placed in a bomb disposal box, and rendered safe by a bomb squad.

Finally, our conclusion that the exigencies of the circumstances justified the warrantless entries and limited searches in question here, is reinforced by the fact that the police were aware that the residence building was owned by an apparently innocent third party, and not by any of the defendants or suspects of the crime. In this case defendant intruder vicariously asserts the privacy rights of the owner. As we have noted, the police had ample reason to suspect that weapons, ammuniton and perhaps other potentially dangerous items (e.g., tear gas cannisters) remained in the fire-damaged basement. Under such circumstances it is wholly unrealistic to presume that an absent property owner would either expect, or desire, the police to postpone, until a search warrant was obtained, entry onto the premises whether for a search for evidence or to protect the property.

Defendant insists, however, that the People have failed to show that it was impossible for the police to obtain a warrant prior to the 2 a.m. and 8 a.m. entries. Viewed in hindsight, from the comfort of our chambers, it might be possible to fault the police for failing to secure a warrant in the early morning hours of April 7, 1968. Such a perspective, however, ignores the acute realities and dangers which the police faced on the night in question. The shooting and fire at 1218 28th Street was only one incident in an explosive, extensive, and continuing series of criminal

incidents. The search for additional participants continued after defendant had been captured and available police officers were undoubtedly employed in that endeavor. (See *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 306-307 [107 Cal.Rptr. 289, 508 P.2d 289].) The time period involved a late Saturday night and an early Sunday morning when a magistrate may not have been readily available. We have no difficulty in concluding that the police, faced with a genuine emergency, were authorized to employ reasonable emergency methods to cope with the situation.

In sum, the totality of the circumstances in this case discloses that the 2 a.m. and 8 a.m. warrantless searches were reasonable, being impelled by exigent circumstances, and as extensions of the 11:30 p.m. aborted search. Accordingly, the evidence seized during the course of both searches is admissible at defendant's trial.

## 2. THE TOYOTA SEARCH

Another codefendant of Cleaver, David Hilliard, was arrested in the residence of Bertha Allen at 1226 28th Street, which was adjacent to the house in which Cleaver and Hutton took shelter during the shootout. After Hilliard's arrest, Ms. Allen found two keys on a black leather strap on the dresser in the bedroom where he had been hiding, and gave them to a police officer who noted they appeared to be for a Toyota automobile. The police then asked the Department of Motor Vehicles (DMV) to identify all cars registered to any of the eight arrestees taken into custody that night; the DMV check revealed that Cleaver's codefendant Wendell Wade was registered as the coowner of a Toyota. Wade's Toyota was located during the early hours of April 7 on an Oakland public street approximately 37 blocks from the scene of the initial shooting on Union Street. The vehicle was towed to the Oakland Police Department parking lot. At 8 a.m. that morning the keys Ms. Allen had found were used to open the trunk of Wade's automobile and several weapons as well as some ammunition were seized as evidence. This search, like those described above, was conducted without first obtaining a search warrant or the consent of defendant or the owner of the vehicle.

Defendant contends that the automobile search was illegal not only because of the failure to obtain a warrant but, more fundamentally, because a warrant could not have been obtained for want of probable cause.

It is axiomatic that the search of an automobile—whether pursuant to a warrant or not—must be supported by probable cause.

(*People* v. *Dumas* (1973) 9 Cal.3d 871, 884 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Dyke* v. *Taylor Implement Co.* (1968) 391 U.S. 216, 221 [20 L.Ed.2d 538, 543, 88 S.Ct. 1472].) We recently noted that probable cause exists to conduct a warrantless automobile search "where an officer is aware of facts that would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched. [Citations.]" (*People* v. *Dumas, supra,* at p. 885.) Was that standard met?

 The recital of the foregoing facts fails to suggest the presence of any "strong suspicion" that the automobile towed from the street contained any specific property lawfully subject to seizure. The People assert that the circumstances under which the police obtained the keys indicated that Hilliard had tried to "dissociate" himself from them and had thus demonstrated his fear that the car which the keys fit would link him to the crimes with which he was charged. The argument is unpersuasive. Wade's automobile was seized before it was known that the keys found at the place of Hilliard's arrest fit that particular Toyota. Furthermore, the automobile was not found in the vicinity of Hilliard's arrest, or even reasonably nearby—it was located a substantial distance away in a wholly different part of the city.

We conclude, accordingly, that the trial court correctly ruled illegal the automobile search here in issue, and suppressed the evidence resulting therefrom.

In S.F. 23758, the alternative writ is discharged and the peremptory writ is denied. In S.F. 23759, let a peremptory writ of mandate issue in accordance with this opinion.

Tobriner, J., Clark, J., and Manuel, J., concurred.

**MOSK, J.**—I agree that the police search of the Toyota automobile was illegal and that the fruits of that search were correctly suppressed by the trial court. I dissent, however, from the holding of the majority that the two police searches of the basement premises at 2 a.m. and 8 a.m. on April 7, 1968, were justified under the "exigent circumstances" exception to the warrant requirement of the Constitution.

I

As the majority acknowledge (*ante,* p. 302), it is settled that in the absence of one of a few carefully circumscribed exceptions the search of a

private home by law enforcement authorities is unreasonable per se unless it is conducted pursuant to a valid search warrant. (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 299, 98 S.Ct. 2408]; *People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130].) The People concede that in the case at bar no such warrant was obtained. It is equally settled, of course, that in the absence of a warrant the burden is on the People to prove that the case falls within the particular exception claimed. (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People* v. *Rios* (1976) 16 Cal.3d 351, 355-356 [128 Cal.Rptr. 5, 546 P.2d 293].) Thus a "grave emergency" may justify a warrantless search, but only upon "a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." (*McDonald* v. *United States* (1948) 335 U.S. 451, 456 [93 L.Ed. 153, 158, 69 S.Ct. 191].)

Here the People made no effort whatever to sustain their burden. The sole witness at the hearing on the motion to suppress was Oakland Police Sergeant Donald Reed, who conducted the 8 a.m. search. When asked by the prosecutor why he undertook the search, his only answer was: "Our purpose was to try and find *any physical evidence* that was at that location that just couldn't be seen or found during the night, the night before." (Italics added.) On cross-examination he agreed again that his intent in conducting the search was "to gather physical evidence." From the remainder of his testimony it is clear that by "physical evidence" the witness meant evidence relating to the earlier gun battle and the identity of the person or persons responsible for it.[1]

The prosecution made even less of a showing as to the 2 a.m. search. The officer who conducted that entry, former Oakland Police Officer Ronald McCurdy, failed to appear as a witness; in lieu of his testimony the prosecutor offered a stipulation of facts, but the stipulation was silent as to the purpose of Officer McCurdy's search. To the extent that purpose can be inferred from the stipulation, moreover, it is contrary to the present claim of specific exigent circumstances: after listing the items found in the 2 a.m. search, the stipulation recited that Officer McCurdy decided to secure the area and depart because under the conditions prevailing at that time he was unable to make "a complete and thorough search of the premises" and he realized "there may be more evidence inside." The plain implication that Officer McCurdy, like Sergeant Reed

---

[1]Thus when subsequently asked what items he found in that search and turned in "as evidence," Sergeant Reed listed the jackets, cartridge belts, ammunition, and personal effects (see fn. 8, *post*) that defendant moved to suppress.

after him, was searching for physical evidence of the gun battle is strengthened by a subsequent amendment to the stipulation, offered by defense counsel and agreed to by the prosecutor, reciting that Officer McCurdy entered the basement "primarily to look for physical evidence."[2]

Thus the actual motive of both officers for their entries onto the premises, according to the testimony and stipulations of the parties, was simply to search for and seize physical evidence of the gun battle and its perpetrators. This is, after all, what one would expect police officers to do: for example, Sergeant Reed was assigned to the homicide detail, not the arson detail. But their desire to find such evidence, while natural, was obviously not an "exigent circumstance" excusing their failure to obtain a search warrant for the very same purpose.

Rather than holding that the People did not sustain their burden of justification, however, the majority shoulder the task themselves. Seizing on defense counsel's remark that the purpose of Officer McCurdy's entry was "primarily" to search for physical evidence, the majority speculate at length on hypothetical "secondary" purposes for both searches: they boldly assert that "Obviously, there existed other reasons" for the entries (*ante,* p. 306), and propose some four or five (*ante,* pp. 305-306). The fatal weakness of this analysis is that it is devoid of support in the record: whether through lack of evidence or ineptitude, the prosecution failed to prove at the hearing that either Officer McCurdy or Sergeant Reed in fact acted on any of the theories now urged by the People and adopted by the majority.

It is settled by a series of decisions of this court that in the absence of such evidence we will not entertain the People's claim of justification: "The purpose of the exclusionary rule—to deter unreasonable searches and seizures by law enforcement officers—would clearly be frustrated if the courts were required to uphold a search conducted on unreasonable grounds simply because the prosecuting authorities belatedly managed to devise an alternative theory on which the arresting *officer* could have acted reasonably if he had known of it. Compliance with the fundamental guarantees of the Fourth Amendment is not a game to be won by inventive counsel, but a practical, day-to-day responsibility of law enforcement personnel. Accordingly, just as a warrantless arrest or search

---

[2]In fact Officer McCurdy was accompanied by Officer Martin Hussey, who was deceased at the time of the hearing. Because the latter never testified, I shall refer for the sake of simplicity to Officer McCurdy's conduct as if he acted alone.

cannot be justified by facts of which the officer was wholly unaware at the time [citations], so also it cannot be justified on theories thereafter invented for the consumption of reviewing courts [citations]." (Italics in original; fn. omitted.) (*People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205]; accord, *People* v. *Miller* (1972) 7 Cal.3d 219, 226-227 [101 Cal.Rptr. 860, 496 P.2d 1228]; *Mestas* v. *Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977].)[3]

Indeed, upon examination of the briefs on file herein it appears that at least one of the reasons that the majority propose for the searches—i.e., to preserve evidence that might become damaged by fire or water—was not even suggested by the People. Such speculation not only violates the general principle that the burden to show justification for a warrantless search is on the People rather than on this court, it also violates the specific rule of *Simon* and its progeny. As Justice Tobriner explained, writing for the court in *Mestas* v. *Superior Court* (1972) *supra,* 7 Cal.3d 537, 542: "Although *Simon* speaks of justifications for search invented by the prosecuting authorities, *Simon*'s argument applies equally to the initiation of such new justifications for search by the reviewing court itself. The court, at the appellate level, cannot invoke a new theory based upon the premise that the arresting officer in making the search *could* have acted reasonably upon a particular ground when the prosecution has failed to make a factual showing at the original hearing that the arresting officer did act upon that ground." (Italics in original.)

Here the prosecution wholly "failed to make a factual showing at the original hearing" that either Officer McCurdy or Sergeant Reed acted on any of the emergency grounds now invoked. It follows that the People cannot be heard to rely on such grounds, " 'for it would be a logical absurdity for the courts to be asked to determine the reasonableness of an officer's belief [in the existence of exigent circumstances] . . . unless it were first established that the officer did entertain such a belief.' " (*People* v. *Miller* (1972) supra, 7 Cal.3d 219, 226 (per Tobriner, J.).)

---

[3]In the cited cases we applied this rule in reviewing belated claims that police officers had probable cause to arrest or search without a warrant because they believed the defendant had committed an offense or was in possession of contraband. The reasons there stated (see also *Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 28-32 [98 Cal.Rptr. 148]) are no less persuasive in the present context, i.e., in reviewing a belated claim that police officers had the right to enter and search a dwelling without a warrant because they believed there were "exigent circumstances." (See also *In re Tony C.* (1978) 21 Cal.3d 888, 893, fn. 2 [148 Cal.Rptr. 366, 582 P.2d 957] [extending the *Simon* rule to claims that a police officer has the right to conduct an investigative stop or detention because he suspects the defendant is involved in criminal activities].)

The majority seem to attempt compliance with the *Simon* rule by lamely remarking that the circumstances now invoked "were known to the officers" at the time. (*Ante,* p. 305.) If this is intended as a reference to our statement in *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], that "in each case the claim of an extraordinary situation must be measured by the facts known to the officers" (see *ante,* p. 302), the reliance is misplaced. In the quoted passage from the *Ramey* opinion we merely reiterated the general principle that each case of justification on emergency grounds must be decided on its own facts, and at the very least the facts assertedly excusing the lack of a warrant must have been known to the officer at the time. The *Simon* rule, however, is the *next* step in the analysis: not only must the officer have actually known the circumstances on which he claims to have based his decision, he must also testify to those circumstances at the suppression hearing; otherwise the reviewing court cannot itself know what the officer's true reasons were, and might be led to uphold an unjustifiable search simply because counsel for the People "belatedly managed to devise an alternative theory on which the arresting officer *could* have acted reasonably if he had known of it." (*Simon,* at p. 198 of 7 Cal.3d.) Thus *Ramey* was not intended to modify the *Simon* rule in any way—as shown by the fact that more than two years after *Ramey* we applied *Simon* in *Tony C.* (See fn. 3, *ante.*)[4]

## II

Even if the *Simon* rule had been complied with, the claimed "exigent circumstances" remain inadequate to justify the warrantless searches at 2 a.m. and 8 a.m.

As the majority recognize (*ante,* p. 302), we defined "exigent circumstances" in *Ramey* to mean "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (16 Cal.3d at p. 276.) We thus identified four grave risks that the doctrine seeks to avoid: danger to life, serious damage to property, escape of a suspect, and destruction of evidence. It is true that on its face the definition qualifies only the first and third of these as "imminent," but it would be a wilful misreading to conclude the other two risks need not be "imminent" as well. We simply refrained from repeating the same qualifier four times in one sentence for obvious reasons of style; the intent

---

[4] I believe I can speak with some confidence on *Simon, Ramey,* and *Tony C.,* as I authored the majority opinions for the court in all three cases.

of the quoted passage as a whole was to require that each of the risks invoked be "imminent" in order to justify the exception. (See fn. 4, *ante.*)

This is so, of course, because the entire *raison d'etre* of the emergency exception is the necessity for "swift action." The courts recognize that the procedures for obtaining a warrant ordinarily entail a certain delay, even with modern methods of communication. (See Pen. Code, §§ 850-851 [telegraphic search warrants], 1528, subd. (b) [telephonic search warrants].) In most cases the delay is the price that members of a free society are willing to pay for the protection of their privacy by "the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.'" (*United States* v. *Chadwick* (1977) 433 U.S. 1, 9 [53 L.Ed.2d 538, 547, 97 S.Ct. 2476].) But in a few instances the price is deemed too high: when the delay is likely to result in a harm to society that is believed to outweigh the corresponding loss of privacy, the police may be permitted to act without prior authorization of a magistrate. This is the so-called "exigent circumstances" exception to the warrant requirement.

Like all such exceptions, however, a claim of exigency must satisfy several essential preconditions. First, because of the weight given to the right of privacy by the framers of the Constitution (see, e.g., *United States* v. *Chadwick, supra,* 433 U.S. at pp. 7-11 & fn. 6 [53 L.Ed.2d at pp. 545-548]), the threatened harm will not tip the scales unless it is sufficiently grave. It is for this reason, for example, that in the above-quoted definition from *Ramey* we limited warrantless intrusions for the protection of property to cases of danger of "*serious* damage to property." (Italics added.)

Secondly, the risk of the harm actually occurring must be substantial: the constitutional protection is not outweighed by the threat of an injury, albeit severe, that is highly unlikely to happen. Thus the police could not justify a warrantless entry into a house during a thunderstorm on the theory that if it were struck by lightning incriminating evidence on the premises might be destroyed. Finally, as emphasized in *Ramey* the risk must be imminent. In other words, the injury must not only be likely to occur, it must be likely to occur very soon—in particular, before a warrant can be obtained. As we concluded in our unanimous decision in *People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261], "the exception must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, an *imminent and*

*substantial* threat to life, health, or property—the constitutionally guaranteed right to privacy must prevail." (Italics added.)

With these principles in mind, let us examine the "exigent circumstances" proposed by the majority to support the warrantless searches at 2 a.m. and 8 a.m. The task is made difficult by the tendency of the majority to lump together, and then repeat in varying combinations, the circumstances relied upon. (See *ante,* pp. 305-306.) Perhaps their primary claim is that the entries "were justified by the need to preserve evidence threatened with destruction by fire or water in the basement." (*Ante,* p. 305.) Destruction of evidence is certainly one of the dangers listed in the *Ramey* definition of exigent circumstances, as the majority themselves emphasize (*ante,* p. 302). But on the face of the record it clearly appears that in the case at bar the risk was neither substantial nor imminent.

To begin with, there was no danger of "destruction by fire" for the simple reason that by the time the officers conducted the 2 a.m. and 8 a.m. searches the fire in the basement had long since been extinguished. Indeed, the prosecutor stipulated that when Officer McCurdy first arrived on the scene at 11:30 p.m.—i.e., two and one-half hours earlier—the firemen were already "completing their duties of putting out the fire" and were "in the mopping up process." The People neither proved at the hearing nor claim now that the firemen failed to finish the job in the ensuing two and one-half hours. Nor do the People contend there was any risk whatever that the fire might have remained smoldering and somehow rekindled itself thereafter. On the contrary, large quantities of water had been poured into the building: Sergeant Reed testified that when he entered the premises some seven or eight hours later he had to proceed carefully because "the fire department left about three inches of water on the basement floor." To posit a danger of "destruction by fire" in such circumstances is to defy not only the laws of search and seizure but also the laws of chemistry and rationality.

The majority, however, have another string to their bow: it is adroitly suggested that an unexploded tear gas cannister might have remained on the premises and might later have detonated itself and started a new blaze. Thus the majority remind us no less than twice that the fire was caused by "exploding tear gas cannisters" (*ante,* pp. 305-306); they stress that in the 2 a.m. search Officer McCurdy found a live cannister "of the type which had initially set fire to the building" (*ante,* p. 306); and they conclude that the cannister must have "remained a threat" because it was removed in a "bomb disposal box" and rendered safe by a "bomb squad"

(*ante,* p. 306). The inference we are obviously expected to draw is that other such "threats" existed and hence justified the police searches.

Unfortunately, there are several major flaws in this scenario. First, it implies that although numerous firefighters had been called to the scene, the suppression or prevention of a further blaze somehow became a police function. Next, from the presence of one unexploded tear gas cannister on the premises it extrapolates a substantial likelihood that there were others, despite a total lack of evidence as to the frequency of such misfirings.[5] And most important, the majority's theory blandly assumes that a tear gas cannister that fails to ignite in the normal sequence after it is launched is likely to "go off" by itself hours later without human intervention. There is not the slightest evidence in the record to support this assumption: Sergeant Reed did not so testify, and the prosecutor did not offer to so stipulate. Nor can this court presume to fill the gap: if tear gas cannisters are actually predisposed to such "spontaneous combustion"—which I doubt—it surely is not so universally known or indisputable as to be a proper subject of judicial notice. (Evid. Code, §§ 451, subd. (f), 452, subd. (h).)[6]

The fact that the cannister found on the scene was disposed of by a bomb squad does not prove the assumption, as the majority seem to believe. At most, the precaution tends to show that such a device can be dangerous if handled by untrained persons—a proposition with which I have no quarrel. But even if we assume the likelihood of more unexploded cannisters on the premises, the risk of intermeddling by laypersons was nil. This is so because of several further facts to which the prosecutor stipulated: (1) the gun battle ended at approximately 11 p.m.; (2) of the two persons who emerged from the basement at that time, one was killed and the other was arrested; (3) in the course of his initial entry a half hour later Officer McCurdy saw there were no other persons in the basement; and (4) by that time the entire area had been "cordoned off and sealed" by the police.[7] In such circumstances the risk of a new fire in this watersoaked basement, whether from internal or

---

[5]The majority even praise the 2 a.m. intrusion as "well rewarded" by the finding of the unexploded cannister. (*Ante,* p. 306.) I had thought it long settled that a search "cannot be justified by what it turns up." (*People* v. *Brown* (1955) 45 Cal.2d 640, 643-644 [290 P.2d 528], and cases cited.)

[6]Any such judicial notice would also be invalid for failure to afford the parties "reasonable opportunity" to rebut it, as required by law. (Evid. Code, §§ 450, 455, subd. (a), 459. subd, (c).)

[7]Sergeant Reed confirmed in his testimony that when he arrived on the scene he found other officers on duty "To guard the location and seal it off."

external causes, was no more substantial than the chance of a direct hit by a lightning bolt in the thunderstorm hypothesized above.

Nor was there any greater risk that evidence would be destroyed by water. To be sure, the People established there was a large amount of water on the premises. What they failed to prove, however, is a substantial likelihood there was any evidence that could have been adversely affected by that fact, i.e., evidence that (1) had not already been damaged by the water poured into the building in the course of extinguishing the fire and (2) could not survive further immersion while a warrant was obtained. The sole proof on the point was that Officer McCurdy found a rifle, some ammunition, and a tear gas cannister during his search, and that Sergeant Reed in turn found several jackets, cartridge belts, more ammunition, and a few personal articles.[8] But these are all reasonably durable, water-resistant items, and none would have been destroyed or even significantly damaged by remaining in situ for the time needed to procure a warrant.

Lacking proof of any water-soluble evidence, the majority once more resort to unbridled speculation: "Any papers or records in the basement," say the majority, "could have been . . . rendered illegible by the water." (*Ante,* p. 305.) Yet while it was substantially probable from the prior gun battle that defendant and his companion would have taken weapons and ammunition into their basement refuge, there was no similar basis for inferring they would also have carried in incriminating "papers or records." Even were they likely to have done so, there was neither testimony nor stipulation establishing that a few hours' immersion in cold water is substantially likely to make "illegible" the contents of a piece of paper, whether it be printed, typed, or handwritten in pencil or in ordinary ink—such as the ink of the three ballpoint pens found by Sergeant Reed. Common experience, in fact, teaches the contrary: only so-called "washable" inks dissolve in so short a time. And if the hypothetical "papers or records" invented by the majority had been written in such ink, there is no showing their contents would have survived the initial drenching by the fire department in any event.

In short, on this record the majority can reach their desired risk of the destruction of evidence "by fire or water" only by piling assumption upon assumption, conjecture upon conjecture. The technique manifestly violates both the letter and the spirit of the emergency exception to the warrant clause.

[8]The latter articles were a nail clipper, a cigarette lighter, a pair of broken sunglasses, two brushes, and three ballpoint pens.

We need not linger over the remaining "exigent circumstances" proposed by the majority, as each is inadequate for the foregoing reasons. Thus the majority assume that "live ammunition may well have been in danger of burning or exploding." (*Ante,* p. 305.) But there was no such danger because the fire was out. The majority profess concern for "the very safety of the building and its contents" (*ante,* p. 305), but again the presumed threat is fire or explosion. The majority seem to fear that an innocent third party such as the owner of the house in question might have been hurt by "weapons, ammunition and perhaps other potentially dangerous items (e.g., tear gas cannisters)" left on the scene. (*Ante,* p. 306.) But the majority admit that the police had removed the owner from the house for safety reasons several hours earlier (*ante,* p. 301), and the possibility of other interlopers was negligible in view of the fact that the police had sealed off the entire area.

Similarly without support in the record is the majority's multiple speculation that other persons who participated in the earlier ambush of the police officers on Union Street might still have been at large, and "the basement might have contained evidence leading to the immediate apprehension" of such "remaining suspects." (*Ante,* p. 305.) It is undisputed that six persons were arrested shortly after the initial confrontation, and two more—defendant and his companion—took temporary refuge in the basement. But there is no evidence whatever to support the assumption that any persons other than these eight participated in the ambush or ensuing gun battle; no witness so testified, no counsel so stipulated.

It is true that in appropriate circumstances the hot pursuit of a fleeing felon may justify a warrantless entry under the emergency exception. (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642]; *People* v. *Smith* (1966) 63 Cal.2d 779, 795-797 [48 Cal.Rptr. 382, 409 P.2d 222].) But in each of those cases the police were closely pursuing a specific, identifiable, flesh and blood criminal whom they reasonably believed was on the premises and would escape unless they acted without delay. Here, by contrast, the majority conjure phantom suspects out of thin air; and because such specters were nowhere to be seen on the premises, the majority further conjecture that in fleeing from their hideout defendant and his companion conveniently left behind the names and addresses of these incorporeal accomplices. Yet evidence of identity is ordinarily no more than part of the evidence of guilt—and a search for evidence of guilt requires a warrant. To avoid this dilemma the majority attempt to force the case back into the "emergency" mold by

one last speculation: they assume not only that the basement might have contained evidence identifying the phantom suspects, but also that such evidence would result in their "immediate apprehension." Surely these figments of the majority's fertile imagination are too insubstantial to outweigh the fundamental right of privacy protected by the Constitution.

## III

As noted at the outset, for a risk of harm to satisfy the preconditions of the emergency exception it must be not only substantial but imminent: the People must show that the harm was likely to have occurred before a warrant could be obtained. Again they fail to sustain this burden, and again the majority fill glaring gaps in the record by unfounded conjecture.

It is undisputed that the 2 a.m. and 8 a.m. searches were conducted some 3 and 9 hours, respectively, after the shooting stopped and the fire was put out, and throughout that period of time the police made no effort to get a warrant. The majority reluctantly acknowledge that "Viewed in hindsight, from the comfort of our chambers, it might be possible to fault the police for failing to secure a warrant in the early morning hours of April 7, 1968." (*Ante,* p. 306.) But the majority decline to do so for two reasons, both demonstrably inadequate.

First it is claimed that the shooting and fire were only part of a "continuing series" of criminal incidents and that even after defendant was captured "The search for additional participants continued" (*ante,* p. 307). As explained above, this assertion is wholly lacking in support in the record. The majority then cite *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 306-307 [107 Cal.Rptr. 289, 508 P.2d 289], in an apparent effort to bring this case within its holding that in appropriate circumstances the failure to seek a warrant may be excused on the ground of impracticability. But the circumstances of *Sommerhalder* are easily distinguishable from those before us. As we there emphasized, the house to be searched was in "a rural area, outside the city limits"; there were four arrestees but only eight police officers to guard and transport them; and there was a real possibility of an imminent attack by a rival gang.[9] In the case at bar, by contrast, the building to be searched was located in the heart of Oakland, only a few minutes away from the courthouse; the record is devoid of

---

[9]Indeed, in preparation for that attack the occupants of the premises "had wired a homemade bomb to the front yard and had erected barricades inside the house." (*Id.,* at p. 305, fn. 7.)

evidence that any other attacks were impending; and there was only one live arrestee but many policemen on the scene. In these circumstances it is fanciful to suggest, as do the majority (*ante,* p. 306), that the "available police officers" were employed in searching for hypothetical additional participants in the prior affray. I cannot believe that no one on the entire Oakland police force—to say nothing of the district attorney's staff—could be spared to apply for a search warrant. Not even the People make such an improbable claim.

Secondly, noting that the period during which the People failed to seek a warrant was "a late Saturday night and an early Sunday morning," the majority assume that at such times "a magistrate may not have been readily available." (*Ante,* pp. 306-307.) But the warrant clause of the state and federal Constitutions is not automatically suspended every evening and all day on weekends. Rather, various procedures have been devised in our trial courts for conducting necessary judicial business—including the issuance of search warrants—during such periods.[10] There is no showing —and again the People do not claim—that such a procedure was not in effect at the time and place in question, In the absence of such a showing, I cannot believe that a search warrant was unobtainable on a Saturday night in a large metropolitan community such as Oakland.[11]

Even less can I believe the police did not have ample opportunity to apply for a warrant on the following morning, when the premises had been totally secured for hours. As pointed out above, at least by midnight the gun battle was over, defendant was under arrest, his companion was dead, the fire was out, there was no one left in the basement, and the area was sealed by the police. Law enforcement authorities were obviously in full command of the situation; no reason is suggested by the People or by the majority why the police could not have preserved the status quo the next day for as long as they desired, and thus have applied for a warrant at their complete convenience. Indeed, by ruling that the 8 a.m. search was illegal, the trial judge herein impliedly but necessarily found the police *did* have the opportunity to obtain a warrant for that intrusion. The

---

[10]Thus although the trial courts are ordinarily closed "Every Saturday from noon to midnight" (Gov. Code, § 6702) and all day Sundays (*id.,* § 6700, subd. (a)). Code of Civil Procedure section 134, subdivision 3, specifically authorizes them to be open at such times "For the exercise of the powers of a magistrate in a criminal action . . . ." (See also Pen. Code, § 810, subd. (a), added in 1973.)

[11]In 1968 Alameda County had 20 superior court judges, at least 20 municipal court judges, and 2 justice court judges. (Judicial Council of Cal., Annual Rep. (1969) pp. 172, 195, 246.) In addition two Supreme Court justices and several Court of Appeal justices resided in Alameda County. All were qualified to act as magistrates (Pen. Code, § 808) and to issue search warrants (*id.,* § 1523 et seq.).

majority reject that finding of fact without explaining why it is unsupported by the record; yet they cannot deny that the local judge who so ruled was much closer to the scene than we in "the comfort of our chambers."

## IV

Apparently as an additional ground for their holding, the majority argue that since Officer McCurdy's initial warrantless entry at 11:30 p.m. was lawful under the emergency doctrine, the 2 a.m. and 8 a.m. searches were also lawful because they were merely "continuations" or "extensions" of that entry. For the latter proposition the majority rely heavily on the United States Supreme Court decision in *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942]. (*Ante,* pp. 303-304.) The majority's reading of *Tyler,* however, is both superficial and incomplete. It is also erroneous, for on close analysis it will be seen the decision in fact supports the position of this dissent.

In *Tyler* a blaze of unknown origin broke out shortly before midnight in a furniture store operated by the defendants. At 2 a.m., after it had been brought under control, Fire Chief See arrived "to determine the cause" of the fire. He was shown evidence of possible arson—two containers of flammable liquid—and called Police Detective Webb. The latter took photographs of the containers and the interior of the store, but finally abandoned his efforts because of smoke and steam. Chief See then looked through the building "to see if there was any further evidence, to determine what the cause of the fire was." At 4 a.m., after the fire had been extinguished and the firefighters had left the premises, Chief See and Detective Webb also departed with the containers. At 8 o'clock the next morning Chief See briefly reentered the building with Assistant Chief Somerville, whose job was to determine the "origin of all fires" in the jurisdiction. Somerville returned at 9 a.m. with Detective Webb, and a search revealed additional evidence of arson—burn marks suggestive of a fuse trail. After leaving to obtain tools, they again entered the building and seized the incriminating evidence. At that time Somerville also searched the rubble "for any other signs or evidence that showed how this fire was caused." There was no warrant for any of these entries.

Several weeks later a state police officer, Sergeant Hoffman, also entered the premises without a warrant and seized additional incriminating material. All the foregoing evidence was introduced over objection at trial. The defendants were convicted of conspiracy to commit arson, and they appealed. The Michigan Supreme Court held that all the evidence

except the two containers seized in the initial entry was illegally obtained, and reversed the judgment. (*People* v. *Tyler* (1977) 399 Mich. 564 [250 N.W.2d 467].) The United States Supreme Court granted certiorari.

The high court began by establishing (436 U.S. at pp. 504-508 [56 L.Ed.2d at pp. 495-497]) that an official entry into a commercial building to determine the cause of a fire is no less subject to the warrant requirement than a police search of a private home for evidence of crime.[12] Turning to the facts of the case, the court first ruled that the initial warrantless entry by the firemen to fight the blaze was justified under the emergency exception, and that Chief See's seizure of the two suspicious containers was permissible under the plain view doctrine. (*Id.,* at p. 509 [56 L.Ed.2d at p. 498].) The court next explained that in the context at hand the "emergency" included not only putting out the fire but also quickly investigating its origin: "Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence . . . ." (*Id.,* at p. 510 [56 L.Ed.2d at pp. 498-499].) The court added that "Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction"—and in the context it is plain that the reference is to evidence of the cause of the fire. (*Ibid.*) And the court concluded that "For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." (Fn. omitted.)

The high court then addressed the fact that the officials did not actually "remain in [the] building" but left it for some hours prior to the early morning reentries. Taking a practical view of the situation, the court observed that during their initial entry the officals only "began" their investigation into the cause of the blaze; that they interrupted their inquiry at 4 a.m. because visibility was impaired by darkness and smoke; and that when they returned shortly after daylight it was "to continue their investigation." (*Id.,* at p. 511 [56 L.Ed.2d at p. 499].) "Under these circumstances," the court concluded, the reentries later that morning "were no more than an actual continuation of the first," and hence were justified by the same emergency.

It is this language of *Tyler* that the majority seize upon to support the 2 a.m. and 8 a.m. searches in the case at bar. But in so doing the majority draw the wrong analogy to *Tyler* because they overlook the importance of

[12]In so declaring, the court rejected the state's contention that there is no legitimate expectation of privacy in a fire-gutted building—a claim also made by the People herein.

the actual disposition of the case—and thereby miss a critical distinction made by the high court. In *Tyler* the fire officials conducted their searches on the morning after the incident for the very same purpose as their initial entry during the night: i.e., to determine the cause of the blaze. It was because of this identity of purpose that the high court ruled those searches were justified by the original emergency and needed no warrant.[13] Why then did the court agree with the Michigan Supreme Court that the defendants were entitled to a new trial? (*Id.,* at p. 512 [56 L.Ed.2d at p. 500].) Because of the admission of incriminating evidence obtained by Sergeant Hoffman in *his* warrantless searches of the premises. The initial entries by Chief See and Detective Webb had given them probable cause to believe the source of the fire was arson committed by these defendants. Sergeant Hoffman was an arson investigator of the Michigan State Police, and was apparently sent to the premises in order to gather evidence of that crime: the court recited that his several warrantless intrusions were conducted "for the sole purpose 'of making an investigation [i.e., of arson] and seizing evidence.' " (*Id.,* at p. 503 [56 L.Ed.2d at p. 494].) The court held those entries were "clearly detached from the initial exigency, and hence were invalid for lack of a warrant. (*Id.,* at p. 511 [56 L.Ed.2d at p. 499].) Because the evidence thus obtained "played a substantial role at trial" (*id.,* at p. 503 [56 L.Ed.2d at p. 494]), the judgment of conviction could not stand.

Explaining its holding, the court stated that "if the investigating officials find probable cause to believe that arson has occurred and require further access to gather evidence for a possible prosecution," not only is a warrant required but "they may obtain a warrant only upon a traditional showing of probable cause applicable to searches for evidence of crime." (*Id.,* at p. 512 [56 L.Ed.2d at p. 500].) Sergeant Hoffman's warrantless entries were thus illegal not simply because they occurred at a time other than the emergency; they were illegal because his *purpose* in searching the premises was not to learn the cause of the fire—he already had ample grounds to believe it was arson—but "to gather evidence for a possible prosecution." Accordingly, those searches could not be deemed a "continuation" of the first entry, and were invalid for lack of a warrant.

In the case at bar the majority are strangely reticent in discussing the actual holding of *Tyler.* Yet its relevance is clear. Here, as in *Tyler,* there

---

[13]Proximity in time, of course, was also essential. The court emphasized that only a few hours separated the entries in question, and warned that "Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches. [Citations.]" (*Id.,* at p. 511 [56 L.Ed.2d at p. 500].)

was an initial warrantless intrusion permissible under the emergency exception: the 11:30 p.m. entry by Officer McCurdy. Because defendant did not question that entry, the prosecutor was not called upon to justify it; in the circumstances, however, Officer McCurdy could lawfully have entered without a warrant at that time for the limited purpose of conducting an immediate search of the premises for other suspects or for victims. (See, e.g., *Mincey* v. *Arizona* (1978) *supra,* 437 U.S. 385, 392 [57 L.Ed.2d 290, 299-300]; *People* v. *Sommerhalder* (1973) *supra,* 9 Cal.3d 290, 305.[14] But as noted above, the prosecutor stipulated that Officer McCurdy fulfilled that purpose during his initial sweep, when he saw there was neither suspect nor victim left at the scene. The later entries by Officer McCurdy and Sergeant Reed, like those of Sergeant Hoffman in *Tyler,* were undertaken for the very different purpose of gathering evidence of crime committed at that location—in *Tyler,* arson; here, assaults with a deadly weapon on the police. Again as in *Tyler,* therefore, a warrant for the entries was required, supported by "a traditional showing of probable cause applicable to searches for evidence of crime." (436 U.S. at p. 512 [56 L.Ed.2d at p. 500].) Lacking such a warrant, the searches were illegal under the authority of *Tyler* itself.

In conclusion, I am impelled to observe that the majority opinion regrettably illustrates the maxim that controversial cases, like hard cases, sometimes make bad law. As a principle we all readily agree that courts must beware of allowing the notoriety of the crime or the defendant to have any effect, however subtle, on their decision. Yet I wonder if we would have had as much trouble disposing of this case if it had involved an obscure pair of robbers caught in a routine shootout with the police, rather than Eldridge Cleaver and the Black Panthers in a well-publicized confrontation during the turbulent days of the 1960's. I urge only that we apply the same constitutional principles to this defendant that we would to any person charged with the crime—and that we decide this case on the record we have, not on the record conjured up by the majority.

Bird, C. J., concurred.

The application of petitioner and real party in interest Cleaver for a rehearing was denied July 12, 1979. Newman, J., did not participate therein. Bird, C. J., and Mosk, J., were of the opinion that the application should be granted.

---

[14]His purpose was not to learn the cause of the fire, as everyone at the scene knew it had been started by tear gas cannisters lobbed into the basement by besieging police forces. Arson was out of the question, as there was obviously no reason to believe that defendant and his companion had deliberately set fire to their own place of refuge.