[Crim. No. 34871. Second Dist., Div. Two. Nov. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP EARL SCHEIB, Defendant and Appellant.

COUNSEL

Rosana M. Selesnick, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**COMPTON, J.**—Defendant was convicted in a nonjury trial of seven counts of violating the Dangerous Weapon Control Law. Specifically, he was found guilty of possessing explosives, hand grenades, machine guns and a silencer.

On appeal, defendant challenges the validity of the seizure by deputy sheriffs of the various items of weaponry and the sufficiency of the evidence to support the trial court's finding that he was in possession of the items on the dates of the alleged offenses. We affirm.

The various contraband items, the possession of which was charged to defendant, were part of a large quantity of such items recovered from three locations, i.e., an uninhabited area near Lancaster, an uninhabited area near Wrightwood and the residence of one Donald Wiggins in Ontario.

In arguing that the various items of contraband should have been suppressed and their use as evidence precluded, defendant focuses on the seizure of items in the Lancaster area. He contends that it was this initial seizure which led police to Wiggins and the contraband found in the other locations and that all of this additional evidence was the product of the initial unreasonable seizure.

FACTUAL BACKGROUND

On December 5, 1976, two residents of the Antelope Valley area contacted the Los Angeles County Sheriff's office. Each of them stated that their children had, from time to time, been playing in an uninhabited area approximately 800 to 1,000 yards from their home and had brought home various military items such as rations, first aid kits and shelter halves.

When these children brought home some hand grenades and parts from an 81 mm. mortar, one of the parents went to the area and found an underground cache containing mortar rounds and dynamite caps. The above mentioned residents delivered the items to the deputies and then directed them to the general area.

At the suppression hearing evidence was adduced concerning the nature of the area. The deputies described the area as pasture land with fences throughout the area although it was not necessary to cross any fences to reach the site where the contraband was ultimately found. The roads in the area were dirt trails.

There were some "no trespassing" signs in the area, but the deputies testified that they did not recall seeing them. In order to get vehicles

into the area one of the residents who had a key in his possession opened a gate across one of the roads. The deputies, although they did not know who owned the property, believed that these residents had legal access to the property.

Upon arriving at the site, the deputies observed, in plain sight, several five gallon drums containing a high explosive "picric acid." Scattered about on the ground were machine gun parts, belted machine gun ammunition and detonating caps.

The residents then led the deputies to an underground bunker. Inside the bunker the deputies found mortar ammunition and various items used to construct "booby traps."

Believing that there was a probability that other explosives and dangerous materials were located in the area and because it was getting dark, the deputies secured the area and directed the residents to repair therefrom.

For the ensuing six days, approximately fifty law enforcement agents continued to search the area on foot during daylight hours. The search turned up a large amount of additional explosives, weapons and ammunition.

The deputies testified that they did not believe it was necessary to get a search warrant because they were in the process of eliminating a dangerous condition that could have resulted in injury to persons coming on the land. They were told that the land was used by many persons for hiking and horseback riding. Furthermore, the deputy in charge of the investigation said that it would have been impossible to describe a limited area to be searched in order to obtain a search warrant.

Subsequent investigation revealed that the property in question was owned by one "William Weaver" who resided in Ontario. Weaver was in fact Donald Wiggins. When Wiggins was first contacted he denied being "William Weaver" but later admitted that he had purchased the property under that name. He gave consent to a search of his residence and place of business, which search produced additional contraband material of the same type as found in the Lancaster area.

Additional contraband was recovered from an uninhabited area near Wrightwood in the San Bernardino mountains. Wiggins admitted

dumping the material there after "panicking" when he saw television accounts of the search activity near Lancaster.

Wiggins later pleaded guilty to several charges of violating the Dangerous Weapon Control Law and agreed to testify for the prosecution against defendant Scheib. That testimony was to the effect that all of the material in question actually belonged to Scheib who had delivered it to Wiggins for storage and safekeeping.

The testimony of Wiggins was corroborated by Scheib's former wife who testified that she had seen Scheib in possession of similar material in his own home in the past. Furthermore, packing slips in defendant's handwriting were found in some of the containers.

### THE SEARCH AND SEIZURE

■ Viewing the evidence in the light most favorable to upholding the ruling of the trial court in refusing to suppress the evidence, discloses simply that deputy sheriffs, as a result of information provided by citizens who resided nearby, believed that explosives and contraband weapons were located in a large area of uninhabited desert land.

This belief was reasonable because under the circumstances the deputies were justified in relying on the information provided by those citizens. (*People* v. *Superior Court,* 6 Cal.3d 704 [100 Cal.Rptr. 319, 493 P.2d 1183]; *People* v. *Flores,* 68 Cal.2d 563 [68 Cal.Rptr. 161, 440 P.2d 233].) The reasonableness of their reliance was bolstered by the fact that these citizens had turned over the hand grenades which they stated came from the property in question.

Based on this reasonable belief, the deputies, without a warrant, went upon the land, looked for and recovered the various items in question. Except for some items found in a makeshift "bunker," all of the items were in plain sight on the ground. The issue is one of whether under the "totality of the circumstances" the deputies' actions were reasonable. (*Cleaver* v. *Superior Court,* 24 Cal.3d 297 [155 Cal.Rptr. 559, 594 P.2d 984].)

As early as 1924, the United States Supreme Court held that the Fourth Amendment protection against unreasonable searches and seizures did not apply to "open fields." (*Hester* v. *United States,* 265 U.S. 57 [68 L.Ed. 898, 44 S.Ct. 445].)

In *People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129], our state Supreme Court upheld the seizure of contraband where an officer walked down a driveway of a house to the rear yard and observed marijuana growing under a tree.

The court reasoned that the contraband was situated in a place where presumably it could have been observed by anyone, such as a deliveryman who might have reason to enter the yard. Thus the conclusion of the court was that the householder had not exhibited a "subjective expectation of privacy" and that in any event such an expectation would have been unreasonable.

More recently in *People* v. *Dumas,* 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208], our Supreme Court traced the development of the various rules in the area of search and seizure and described a "hierarchy of protection" depending on the nature of the place searched.

According to the *Dumas* court, this hierarchy "arises not from the application of differing constitutional standards to various locales, but rather from an application of a single standard of reasonableness to all places in accordance with a fundamental understanding that a particular intrusion into one domain of human existence seriously threatens personal security, while the same intrusion into another domain does not." (*Dumas, supra,* p. 883.)

The court there pointed out that there were some sites regarded as so public in nature that searches are justified without any particular showing of cause or exigency.

In *People* v. *Little,* 33 Cal.App.3d 552 [109 Cal.Rptr. 196], we held that it was error for the trial court to suppress evidence of contraband which had been seized by officers who observed it lying on the ground near where defendant was sleeping. The area was an open field used frequently by numerous persons even though it was in fact private property.

Defendant in that case was not the owner of the property but had written permission of the owner to camp on the property. Our conclusion there was based on our reading in a series of cases, i.e., *People* v. *Landry,* 276 Cal.App.2d 370 [80 Cal.Rptr. 880]; *Lorenzana* v. *Superior Court,* 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33]; *Dillon* v. *Superior Court,* 7 Cal.3d 305 [102 Cal.Rptr. 161, 497 P.2d 505], and

*People* v. *Berutko,* 71 Cal.2d 84 [77 Cal.Rptr. 217, 453 P.2d 721], all dealing with observations made by officers from positions of vantage on private property. In our opinion, these cases compel the conclusion that the officers' conduct in this case was reasonable. The property owner, Wiggins, had no reasonable expectation of privacy which was invaded by any unreasonable government activity.

Defendant directs our attention to *Burkholder* v. *Superior Court,* 96 Cal.App.3d 421 [158 Cal.Rptr. 86], a recent opinion of the Court of Appeal in the First District. In that case officers, without a warrant, entered onto a "marijuana patch" maintained by the defendant on private property in a heavily wooded mountain area and seized the growing plants. The patch was enclosed by trees and chicken wire. The access road was barred by two padlocked gates.

The Court of Appeal ruled that the evidence, i.e., the marijuana plants, should be suppressed on the grounds that defendant had manifested a reasonable expectation of privacy. While the opinion of the court marshals a number of cases which invoke the principle of "expectation of privacy," none of the cited cases, in our opinion, support the conclusion there reached. Certainly that portion of the opinion which, out of hand, declares that the United States Supreme Court decision of *Hester* v. *United States, supra,* is no longer viable, cannot be squared with our Supreme Court's opinion in *People* v. *Dumas, supra,* where *Hester* is cited with approval.

The issue is not simply whether a landowner has exhibited a "hope" of privacy or a desire to avoid detection but instead the issue is whether he has a *reasonable expectation* of privacy. The rationale of *Hester* and *Dumas* is that any subjective expectation of privacy in "open fields" is simply *unreasonable.*

Further, in *Burkholder,* the court did declare that each case must turn on its own peculiar facts and circumstances. The opinion there discloses that defendant had a travel trailer on the premises indicating that he, at least occasionally, resided there. The fact alone distinguishes *Burkholder* from the case at bench.

An additional concept merits consideration here. In *Cleaver* v. *Superior Court, supra,* the California Supreme Court, following the rationale of the United States Supreme Court in *Michigan* v. *Tyler,*

436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942], held that where a fire had occurred in a building it was reasonable not only for fire and police personnel to enter the building to combat the fire, but for the officials to remain on the premises or reenter the premises without a warrant for a reasonable period of time to investigate the cause of the fire or to preserve evidence from destruction.

In the case at bench the presence of explosives and dangerous weapons in an area used by many people, including children, who might be unaware of the presence of such material, constituted a dangerous condition, comparable to a fire, that required immediate neutralization by the public authorities.

The entry of the deputies onto the land in order to render it safe was as justified as the entry of firemen into a burning building. The continued presence of the deputies on the land was justified in order to reasonably insure that all dangerous material had been discovered and removed.

### THE SUFFICIENCY OF THE EVIDENCE

■ Defendant was charged with having possessed various items of contraband in December of 1976, the time of the discovery, and for a period of time prior thereto.

Wiggins testified that defendant delivered these items to him in 1974 and prior. No material was delivered by defendant after 1974, and to Wiggins' knowledge defendant had not been to the Lancaster area although he (the defendant) knew that some of the material was stored there.

The uncontroverted evidence was that defendant and Wiggins jointly acquired and stored the contraband and other supplies in about 1974 for possible future use in case of an invasion or revolution. The above mentioned packing slips in defendant's handwriting indicated that defendant had handled the material sometime after 1974. There was no evidence that defendant had ever abandoned the material or his plan to use it under certain contingencies.

Possession consists of actual or constructive custody of an item with the knowledge of such custody and an intent to exercise dominion or control over the item either directly or through other persons.

The existence of these elements in any given case is a question of fact for the trier of fact. Here there is substantial evidence to support the trial court's finding that defendant continued in constructive possession of the material he delivered to Wiggins up to the time of their seizure by authorities. Since that conclusion is supported by substantial evidence, we are powerless to disturb the trial court's conclusion.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 8, 1980. Mosk, J., was of the opinion that the petition should be granted.