[Civ. No. 57423. Second Dist., Div. Five. Mar. 6, 1980.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
EUGENE COPE, Real Party in Interest.

**COUNSEL**

John K. Van de Kamp, District Attorney, Donald J. Kaplan and Maurice H. Oppenheim, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, Michael Allensworth and Stephen F. Moeller, Deputy Public Defenders, for Real Party in Interest.

**OPINION**

**KAUS, P. J.**—The People seek a writ of mandate (Pen. Code, § 1538.5 subd. (o)) directing respondent court to vacate its order suppressing evidence seized from real party's residence.

FACTS

Carlos Mena lived in an apartment one floor above real party. On May 14, 1979, Mena saw real party leave his apartment, walk to an adjacent building, pour something from a can into a vent in the wall of the building, and ignite it. Mena's wife called the fire department. A police officer, Darbyshire, also arrived at the location, having learned of the fire over his car radio. Although the fire had been extinguished by the time he got there, Darbyshire observed a blackening of the concrete surrounding the vent and a charring of the ground inside it. He spoke to a fire captain at the scene who advised him that the charring of the concrete indicated that the fire had been caused by a volatile liquid.

Darbyshire overheard Mena tell the fire captain that he had seen who started the fire and saw him point out the real party's residence. Darbyshire learned from Mena[1] that he had seen real party carrying a red and white can to the scene of the fire before it started and that after it started real party returned to his apartment, that he was still in there and that he was alone. Mena also stated that he thought real party was crazy because he set off fireworks every night.

Darbyshire went to real party's apartment, knocked loudly with his night stick and identified himself as a police officer. He heard a large dog barking inside, but got no other response. He continued knocking for about two minutes. Then the officer put in a call for a field supervisor. While he was waiting for the supervisor to arrive, Darbyshire heard a noise inside real party's apartment, which he recognized as the sound of a shotgun being closed. He instructed people in the area to get away from in front of real party's windows. He located a Pontiac in the apartment's carport which neighbors had said belonged to real party.[2] He observed an open box of shotgun shells on the floor of the Pontiac.

Darbyshire's supervisor arrived at about this time. He knocked on the wall of real party's apartment, identified himself and told real party to come outside. Real party replied that he was tired, wanted to go to sleep and did not want to be bothered. The supervisor kept repeating his demand and real party kept repeating his response for two or three min-

---

[1] Mena conversed in Spanish. Darbyshire, who had limited knowledge of Spanish, used the fire captain as a translator.

[2] By running the license number of the car, Darbyshire learned real party's name for the first time.

utes. The supervisor then shouted that if real party did not come out, tear gas would be used to force him out. Real party expressed fear for the safety of his dog. He opened his front door and stood inside the screen door. The supervisor opened the screen door, reached inside and pulled real party outside. Real party was handcuffed and placed under arrest for arson.

As Darbyshire approached the apartment he saw a .12 gauge double barreled shotgun inside, resting against the door frame with the barrel pointing up. Because of the shotgun and the possibility of volatile fluids and fireworks being in the apartment, he entered it to check for dangers related to fire or explosion. Real party's dog, which was still inside the apartment, turned out to be a large St. Bernard. The officers did not plan to take the dog into custody, nor does real party contend that they had any obligation to do so or that it was his desire that they do so.[3]

## DISCUSSION

The question before us is whether the facts known to the officer presented a sufficiently exigent set of circumstances to justify his entering the apartment without a search warrant.

Exigent circumstances sufficient to exempt police officers from the need to obtain a search warrant exist when there is an emergency situation which requires "swift action to prevent imminent danger to life or serious damage to property, or to forestall the ... destruction of evidence...." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal. Rptr. 629, 545 P.2d 1333]; *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984].)

In the instant case the officer knew that there was a large dog which would be left unattended in the apartment. He knew that there was at least one firearm inside and he had probable cause to believe that it was loaded. He had probable cause to believe that there were volatile fluids and fireworks in the apartment. He had probable cause to believe that real party had set a fire that night. Given that fact and the neighbor's assessment that real party was "crazy" because of his nightly use of fireworks, the officer could reasonably conclude that real party might have acted irresponsibly in the manner in which he maintained the potentially dangerous substances inside his apartment.

---

[3]There was a humane society officer there to deal with the dog in case it became violent.

It does not require the ingenuity of a Rube Goldberg to imagine the unattended dog knocking over a can of volatile liquid or knocking over and discharging the shotgun, or both, and causing either a fire or an explosion. Had the officer not gone inside and had such an event occurred, the criticism which would undoubtedly have been heaped upon the police department would have been fully justified. (*People* v. *Superior Court* (*Peebles*) (1970) 6 Cal.App.3d 379, 382 [85 Cal.Rptr. 803].)

Although an otherwise unlawful search cannot be validated by what it turns up, what the officer found inside real party's apartment graphically demonstrates the reasonableness of his decision to search based upon the information he had. In addition to the shotgun, which was in fact loaded, he found nine other firearms including two loaded revolvers and four weapons that used black powder. He found boxes of .38 and .22 caliber ammunition and .12 gauge shotgun shells. He found 15 to 20 rounds of ammunition scattered on the living room floor. He found a quantity of black powder scattered about. He found lead balls used in black powder weaponry. He found a can of camping fuel. He found various pyrotechnic devices and chemical compounds on real party's kitchen counter and in his kitchen sink. He found items which resembled sticks of dynamite and which contained gunpowder. The bomb squad was called and determined that these were homemade fireworks or skyrockets and not explosives. Nonetheless, the bomb squad confiscated the pyrotechnic devices, the black powder and what Darbyshire described as "chemicals that could be used to mix explosive devices." In addition to all of the above, real party's electricity had been shut off and there were unlit kerosene lanterns in the apartment. The prospect of a St. Bernard left to his own devices in this environment, in the dark, is enough to send shudders through any reasonable man.

Let a peremptory writ of mandate issue directing respondent court to vacate its order of August 27, 1979, granting real party's motion to suppress evidence and issue a new order denying said motion.

Ashby, J., and Hastings, J., concurred.

The petition of real party in interest for a hearing by the Supreme Court was denied April 30, 1980. Mosk, J., was of the opinion that the petition should be granted.