[No. B004059. Second Dist., Div. Two. Dec. 5, 1986.]

THE PEOPLE, Plaintiff and Appellant, v.
DANIEL FELIPE OSUNA, Defendant and Respondent.

## COUNSEL

Ira Reiner, District Attorney, Harry B. Sondheim, Arnold T. Guminski and Eugene D. Tavris, Deputy District Attorneys, for Plaintiff and Appellant.

Roger J. Rosen and David M. Dudley for Defendant and Respondent.

## OPINION

GATES, J.—Our initial decision in this matter was filed March 29, 1985. Although our Supreme Court subsequently granted defendant's request for review, it has now returned the matter to us "with directions to refile [our] opinion with appropriate reference to *People* v. *Duncan* (1986) 42 Cal.3d 91 [227 Cal.Rptr. 654, 720 P.2d 2]." *Duncan* held the determination whether "the odor of ether and other evidence that an unlawful drug laboratory is in operation constitute[s] exigent circumstances sufficient to justify the warrantless entry and search of a building" is one that "must be made on a case-by-case basis and that in the case at bar the entry and search were justified." (*Id.* at p. 95.) Our high court's directive to "refile [our] opinion," merely adding an "appropriate reference to *People* v. *Duncan,*" demonstrates its members unanimously agreed with our original conclusion. We, therefore, comply with their command and again authorize publication in the hope that this decision will supply yet another helpful example of an instance wherein "entry and search were justified."

The People appeal from the judgment dismissing the criminal action that had charged Daniel Osuna with possessing cocaine for sale (Health & Saf. Code, § 11351; Pen. Code, § 1203.073, subd. (b)(1)). They seek review of the court's order granting defendant's motion to suppress the proofs of his guilt.

In this instance the trial court made clear that its challenged ruling was not based upon any determination of credibility, nor upon the resolution of

those few facts that could be said to have been disputed. Rather it announced its belief that as a matter of law, it was compelled to suppress the evidence by the decision in *People* v. *Dickson* (1983) 144 Cal.App.3d 1046 [192 Cal.Rptr. 897].[1] It specifically urged the People to appeal its order, a recommendation that would have been pointless had it not found the testimony of the People's witnesses credible. As a consequence, we shall accept the potentially determinative facts, and inferences reasonably to be drawn therefrom, that are most favorable to the People.

When so viewed the record would support the conclusion that at approximately 3:15 a.m. on February 8, 1983, Los Angeles County Deputy Sheriff John Villalobos and another officer chanced to pass by a small family residence at the moment, or immediately thereafter, that defendant had completed chemically processing a substantial quantity of raw cocaine into its free base form. During this operation the ether fumes had become so strong defendant became dizzy. He, therefore, had dumped the used chemicals down a toilet and set their containers and the buckets he had been using on the back porch. When combined with other evidence it also appears, at least inferentially, that defendant had drawn back the sheet that ordinarily covered a back window and opened it to aid in dissipating the accumulated toxic odors.[2]

---

[1]After having stated its willingness to assume that the authorities had probable cause to act, the court added, "but I don't see how we can take this out of the Dickson case on that issue of emergency doctrine because regardless of what else you have, the emergency is based on the ether which is the volatile substance and Dickson says that's not enough."

[2]The defendant's Penal Code section 1538.5 motion in the superior court was expressly "based on all of the records, documents, papers, exhibits and evidence on file in this case, on the attached Declaration of ROGER J. ROSEN, and the Memorandum of Points and Authorities, *upon the transcript of the proceedings at the Preliminary Hearing herein,* upon any subsequently filed Memorandum of Law in support hereof, and upon such other and further evidence and argument of counsel as may be presented at the hearing on this motion." (Italics added.)

During defendant's preliminary hearing the magistrate had properly found that after defendant had been admonished as to his constitutional rights, and waived them, as required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], he had made various incriminating statements. These were read aloud at the de novo hearing in the superior court although ultimately the court, citing Evidence Code section 352, mistakenly refused to allow the People even an opportunity to establish again their admissibility.

This ruling was clearly an abuse of discretion since defendant's explanation of his activities was of vital importance in the present proceeding as it fully corroborated the testimony of the People's witnesses and otherwise clarified the events perceived, e.g., the temporary intensity of the ether odor and the need to air out the premises. Being erroneous, we may consider the statement and its contents on this appeal. (See *People* v. *Braeseke* (1979) 25 Cal.3d 691, 700 [159 Cal.Rptr. 684, 602 P.2d 384] [permitted such a review even when the ultimate court ruling is favorable to the People and only the defendant has appealed].) Our so doing, however, will not preclude defendant from obtaining a full de novo factual hearing on the admissibility of his confession upon remand.

"MR. ROSEN [defense counsel]: Let me just tell you briefly what it says here without at

The officers parked and walked back along the street against the wind. The chemical odors grew stronger until they reached defendant's residence where, on the windward side, it essentially disappeared.[3] Officer Villalobos then walked down the driveway of the adjoining property and directed the beam of his flashlight into a window at the rear of defendant's house from which the covering had been partially removed. In plain sight therein, he observed a quart-sized jar on a shelf containing a substance which he believed might be "phencyclidine in its liquid form." While so engaged he heard a dog barking and the sound of a toilet flushing, suggesting that his arrival indeed had coincided with defendant's illegal disposal of his used chemicals by pouring them into the public sewer.

Officer Villalobos believed he might have come upon a "home laboratory" where someone was manufacturing contraband, with all the perils attendant to such an operation.[4] He, therefore, followed the then current policy of the sheriff's office and summoned the fire department before taking further action. That is, originally it had been official policy to effect entry im-

---

all conceding counsel can get by the foundation of the proper waivers here. [¶] Suspect Osuna is advised of his rights. Then the officer tells him that he's conducting an interview based on cocaine investigation. [¶] Then I'm reading, quote: [¶] 'Suspect Osuna stated that he had purchased a jar of liquid cocaine from an individual in Long Beach paying a hundred dollars for the jar. Osuna then went over to his parents house to visit with his brothers. While at the location he and his brothers began drinking Southern Comfort.

"'At approximately 0045 hours his parents and brothers began to go to sleep, each leaving the living room and going to the bedrooms with the exception of his younger brother Carlos who fell asleep on the sofa in the living room.

"'He then began to process the cocaine and purify it through a method he had read in a library book. He stated he had processed a majority of the liquid into its crystal powder form when he heard the dog in the rear yard barking.

"'Suspect stated he then stopped the processing of the cocaine as he noticed he felt dizzy due to the continuous inhalation of the ether and acetone. He then began disposing the ether—'

"It should be 'of the ether.'

"'—and acetone waste in the toilet and completion of the disposal went back into the living room to lay down on the sofa.

"'At this time he heard a loud knock on the front door followed by someone identifying themselves as a deputy sheriff. The front door opened and he began yelling, "I've got no guns. Don't shoot. I've got no guns."'"

[3]The accuracy of the officers' perceptions in this respect was supported by the testimony of the upwind neighbor who stated that he had not noticed the odor of ether a short while earlier when he had returned from his work as a bartender.

[4]Officer Villalobos testified that he personally had never before been called upon to proceed against an illegal laboratory and did not consider himself a true expert in the field although he had taken a course at the Sheriff's Academy in narcotics identification, four hours of which had dealt with PCP, and had been taught the "basics" about its manufacture. He had also received subsequent in-service training in the identification of controlled substances. Through this training he had learned of the chemicals used in manufacturing such contraband and that "specifically ether, is a highly combustible, flammable liquid." He considered the instant situation to have been particularly volatile as a passing thunderstorm was creating considerable electrical activity.

mediately in order "to save lives." Later, however, it had been decided it would be more legally prudent, and pragmatically safer, first to summon the fire department whose personnel would have the necessary expertise to confirm the nature and severity of the situation as well as the equipment to deal with any fires or explosions that might be caused, either accidentally or intentionally, by persons within the premises.[5]

A fire department truck soon arrived as did backup police officers who surrounded the house and cordoned off the immediate area. A fire captain confirmed the existence of the strong chemical odor and the fact that there existed "a very volatile situation that just about any spark could set and ignite the fumes and cause an explosion." Therefore, accompanied by this captain, Villalobos knocked on the front door of the residence with his flashlight and announced his identity. Being unlatched, the door "opened by itself" and the officer observed defendant seated on the sofa inside. From his position at the front door the deputy also "observed some human feet in what appeared to be another bedroom exposed on a mattress."

Villalobos directed defendant to step outside, after which he and other officers roused five individuals sleeping in the adjoining bedroom. A total of nine people including defendant's younger siblings, his parents and grand-parents were removed from the premises.

After Villalobos had assisted the fire department personnel in "clear[ing] the area with their fans and whatnot," he retrieved the jar he had observed earlier, as well as two covered five gallon drums. One was partially filled with ethyl ether anhydrous, the other with acetone.[6] Also recovered were

---

[5]Los Angeles County Fire Code, title 32, section 1.201 provides in part as follows: "The Chief [of the Fire Department] shall be responsible for the administration and enforcement of this Code. Under his direction, the Fire Department shall enforce all ordinances of the municipality and the laws of the State pertaining to: [¶] (a) The prevention of fires. . . . [¶] (c) The storage, use and handling of explosive, flammable, toxic, corrosive and other hazardous gaseous, solid and liquid materials. . . . [¶] (f) The maintenance of fire protection and the elimination of fire hazards on land and in buildings, structures, and other property, including those under construction."

Section 1.205 provides in part as follows: "(a) The Chief and his designated representative shall have powers of peace officers while engaged in the performance of their duties with respect to the prevention, suppression and investigation of fires and the protection and preservation of life and property against the hazards of fire and conflagration."

Section 1.209 provides in part as follows: "(c) The Chief or his duly authorized representative shall have the authority to enter any building or premises for the purpose of extinguishing or controlling any fire, performing any rescue operation, investigating the existence of suspected or reported fires, gas leaks or other hazardous conditions or taking any other action necessary in the reasonable performance of their duty."

[6]Each of these cans bore its original label, including the familiar red "FLAMMABLE LIQUID" emblem. There was only a "minute amount [of acetone remaining,] but the ether still had a very noticeable amount in it . . . ."

several other items containing powdery substances of various colors, each of which, like the jar, emitted the odor of ether.

In determining the instant appeal, we need not, and shall not, seek to review and critique the many ratiocinations contained in *People v. Dickson, supra,* 144 Cal.App.3d 1046. We deem it sufficient to announce our belief that that decision was never intended to preclude our police and fire personnel from taking appropriate measures to protect the public's safety, or designed to "overrule" those many decisions, published and nonpublished, that have approved similar emergency operations. (See, e.g., *People v. Superior Court (Cope)* (1980) 103 Cal.App.3d 186 [162 Cal.Rptr. 667]; *People v. Scheib* (1979) 98 Cal.App.3d 820, 828 [159 Cal.Rptr. 665]; *People v. Patterson* (1979) 94 Cal.App.3d 456 [156 Cal.Rptr. 518]; *People v. Remiro* (1979) 89 Cal.App.3d 809 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135]; *People v. Superior Court* (1970) 6 Cal.App.3d 379 [85 Cal.Rptr. 803]; and *Romero v. Superior Court* (1968) 266 Cal.App.2d 714 [72 Cal.Rptr. 430].) We regard it as no more than an extremely careful effort to indicate why its authors had there found facts which led them to conclude that the general rules should be held inapplicable in that unique instance. Indeed, they were at pains to point out that on other "occasions additional circumstances will be present indicating an ether combustion is imminent. When those circumstances arise, officers have a responsibility to immediately take whatever steps are necessary, including an emergency entry of the premises, to prevent an explosion or fire. . . ." (*Dickson, supra,* 144 Cal.App.3d 1046, 1072, fn. 22.)

The emergency exception to the warrant requirement has long been recognized in this state. In *People v. Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721], our high court stated, "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. [Citations.]" (*Id.,* pp. 377-378. See also *Cleaver v. Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984]; *People v. Sirhan* (1972) 7 Cal.3d 710, 738-739 [102 Cal.Rptr. 385, 497 P.2d 1121]; *Mincey v. Arizona* (1978) 437 U.S. 385, 392-393 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408]; *Michigan v. Tyler* (1978) 436 U.S. 499, 509 [56 L.Ed.2d 486, 498, 98 S.Ct. 1942].)

In the context of justifying a warrantless entry into a home the emergency situation must be such as to ". . . requir[e] swift action to prevent imminent danger to life or serious damage to property . . . . There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr.

629, 545 P.2d 1333]; *People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261].)

Applying these principles to the instant case, it is clear that the evidence was abundantly sufficient to support a finding that Villalobos and the other police and fire department personnel involved, honestly and reasonably believed the public's safety was in imminent danger and acted in a manner consistent with the demands of that emergency.

Two Los Angeles County Sheriff's Department officers with expertise in the handling of hazardous materials and drug manufacturing laboratories, particularly those involving the manufacture of PCP and cocaine,[7] stressed that the primary danger associated with ethyl ether anhydrous is flammability. Its vapors are capable of traveling long distances and "can be ignited by a gas heater, a catalytic converter on a car, a cigarette, a flare, any spark which would give the necessary energy to ignite the substance itself."

Equally forceful was the testimony given by an expert called by the defense, although he also gave proof of the continued verity of Gilbert and Sullivan's observations regarding the lot of a policeman. After having first expressed doubts regarding Officer Villalobos's olfactory abilities while driving, this witness then criticized him and the other police and fire officials *for not having taken even more extreme measures* to ensure the safety of anyone who might have been in the house *or even within the immediate surrounding area*. Thus he testified on direct examination in the following fashion: ". . . Static electricity, sparks, sparks from almost any electrical source can touch off ethyl ether where it takes a lot more energy just to get gasoline, for example, excited enough to chain react.

"The pressure wave that's developed by a highly reactive oxidation which is what happens when ethyl ether goes boom is so sharp that it has the very explosive—it's very damaging shock wave that goes through and creates some substantial shock damage from just the blast itself.

"The fire damage is not as great because it doesn't reach the big temperatures but there is a significant damage from the explosive effect of the ether itself. . . .

"The ignition or explosion of even a quart of ether would be substantial enough at a minimum to blow all the windows out of the house, if not cause

---

[7]One of the officers was "an operations and emergency planning sergeant and . . . also a sergeant assigned to the department hazardous materials response unit." The other was assigned to "detective division headquarters narcotic bureau" as its "training and education public affairs officer . . . ."

a conflagration or fire. Anyone within the vicinity within shooting distance of the windows is exposed to a hazard of flying glass, if nothing else, let alone in this case the fireball would be directed in the other—in a different direction but if there was a subsequent fire then they would be exposed to the hazards of flame as well.

". . . . . . . . . . . . . . . . . . . . . .

"Q. BY MR. ROSEN: What about the neighbors? What would be done in terms of safety precautions for them—people living adjacent to this residence, in back of this residence and across the street from this residence.

"A. *Well, the explosive force would be sufficient to warrant evacuation at a minimum.*

"Q. Would you think that safety precautions would dictate that you would at least notify the adjacent neighbors and give them the option of deciding whether or not they would want to evacuate?

"A. Well, *the safety point of view, I don't know if I'd give them the option* but, yes, I would say that." (Italics added.)[8]

Under such dramatic circumstances, we cannot denounce Officer Villalobos for not taking the time to obtain a search warrant (*Cleaver* v. *Superior Court, supra,* 24 Cal.3d 297, 306) after he had received the expert advice and counsel of the fire department that established his probable cause to act. We know not how quickly a magistrate may be found in Los Angeles at 3:30 a.m., but even if society today could afford to commit such large numbers of its police and fire personnel to mere holding actions, it could not afford the destruction that might ensue if possessors of explosive, and probably illegal, substances, were given an extended period in which to attempt to dispose of them.[9] The dumping of toxic and explosive chemicals

---

[8]Not without justification, the general public has experienced difficulty understanding the ever-expanding judicial nuances that govern the admissibility of evidence in our criminal courts. Who could explain to them a rule that would permit the police when faced with an emergency to awaken and evacuate an entire neighborhood of innocents without prior judicial authorization of any sort, but forbid them similarly to intrude upon the privacy rights of the very persons who had introduced such peril into the community in the first instance? We readily confess we would be reluctant to undertake such an exposition, particularly during that period of unknown duration when the affected citizens were forced to stand about in the street in their sleeping attire awaiting the officers' securement of appropriate warrants.

[9]In addition, of course, even if time were not a compelling factor, such a warrant, once obtained, probably could not give advance authorization for an "emergency entrance." (See *Parsley* v. *Superior Court* (1973) 9 Cal.3d 934, 938-940 [109 Cal.Rptr. 563, 513 P.2d 611].)

into an urban sewer system is a crime itself.[10] It is not only hazardous to the health of those required to work there, it also greatly expands the area of peril beneath the public streets.

It should be emphasized, of course, that while ether may be put to various lawful uses under certain restricted circumstances, this possibility does not undermine the propriety of an otherwise appropriate warrantless entry where such circumstances do not exist. That is to say, whenever a highly flammable chemical is discovered in a quantity and concentration sufficient to create an imminent danger of explosion or fire, the police and fire officials we employ to protect our safety have both the right and the duty to take reasonable steps to eliminate that risk, regardless of the abstract legality of the ultimate use to which its possessor might intend to put it. (See fn. 5, *ante,* and *People* v. *Superior Court, supra,* 6 Cal.App.3d 379, 382, asterisk fn.) In addition, as all the experts here agreed, it is virtually certain that the lawful uses which a private consumer might have for ethyl ether could not give rise to an emergency situation. It is but a minor ingredient in solvents or soil fumigants and there would be no need to stockpile five-gallon drums of 99 percent pure ether.

At the risk of stressing the obvious, we also note that whatever end product someone living in a residential neighborhood may intend to manufacture in his "home laboratory," his conduct ordinarily will be illegal in any event under applicable county ordinances.[11] In fact, no resident of Los Angeles County, may even lawfully possess large quantities of ether without a permit.

Title 32, section 15.103 of the Los Angeles County Code requires a person to obtain a permit for the "[s]torage, handling or use of Class I flammable liquids *in excess of one gallon* in any dwelling or other place of human habitation . . .," subject to certain exceptions not here relevant.

---

[10]Los Angeles County Fire Code, title 32, section 15.110 provides in part as follows: "No person shall permit or cause to be permitted the discharge of flammable or combustible liquids . . . into or upon any street, highway, drainage canal or ditch, storm drain, sewer or flood control channel, lake or tidal waterway, or upon the ground." (See also L.A. County Code, tit. 20, chs. 20.32 (Sanitary Sewers) and 20.36 (Industrial Waste).)

[11]Los Angeles County Fire Code, title 32, section 1.212 provides in part as follows: "(a) Any person operating or maintaining any occupancy, premises or vehicle subject to this Code who shall permit any fire hazard to exist on premises under his control . . . shall be guilty of a misdemeanor."

Section 1.215 provides as follows: "Every person violating any provision of this ordinance or of any permit or license granted hereunder, or any rule or regulation promulgated thereto, is guilty of a misdemeanor. Each such violation is a separate offense for each and every day during any portion of which such violation is committed."

(Italics added.) Ethyl ether is included therein since it has flash points of minus 40° Farenheit (open cup) and minus 49° Farenheit (closed cup) and a boiling point of 94.3° Farenheit. (L.A. County Code, tit. 15, § 15.102(e).)

In addition, these provisions specify that "[i]n locations where flammable vapors may be present precautions shall be taken to prevent ignition by eliminating or controlling sources of ignition." (L.A. County Code, tit. 15, § 15.112.)

In the present proceeding defense and prosecution experts alike agreed that while licensed industrial, academic and medical laboratories employ many safeguards, including the use of ventilation devices, when working with ether, the operators of illicit laboratories not only fail to utilize such precautions, they frequently actually seal their windows with duct tape in an attempt to prevent their activities from being detected. Manifestly such reckless handling of dangerous chemicals vastly increases the danger that an accidental fire or explosion will result.

█ Of course, from the security of our lofty perspective, and despite our total lack of practical experience in the field, we might question whether or not those who physically confronted the danger in this instance, selected the "best" course of action available.[12] █ However, we readily acknowledge our inability to envision any truly "safe" way of defusing these volatile situations and none has been suggested to us.[13] In truth, any action in this type of emergency situation will entail certain risks.

█ The goal of the exclusionary rule is to protect all members of society by inducing those we employ to enforce our laws to conduct themselves in a reasonable manner and in conformity with the spirit and purpose of the Fourth Amendment to the United States Constitution. As a consequence, it should be applied in a rational and common sense fashion with an eye to advancing that objective rather than defeating it. (*United States* v. *Sharpe, supra,* 470 U.S. at pp. 682-686 [84 L.Ed.2d at pp. 613-615]; *United States*

---

[12]"A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, in itself, render the search unreasonable.' [Citations.] The question is not simply whether some other alternative was available but whether the police acted unreasonably in failing to recognize or to pursue it." (*United States* v. *Sharpe* (1985) 470 U.S. 675, 687 [84 L.Ed.2d 605, 616, 105 S.Ct. 1568].)

[13]At one point, the trial court opined, ". . . it seems to me that the most logical way to get people out is just to yell if you think the place is going to blow up." However, employing such a means at 3 a.m. to rouse sleeping people during an emergency, whether due to a criminal enterprise or not, would itself be fraught with danger.

v. *Leon* (1984) 468 U.S. 897, 918-925 [82 L.Ed.2d 677, 696-700, 105 S.Ct. 1568]; see also our own recent observations in *People* v. *Bellomo* (1984) 157 Cal.App.3d 193, 196 et seq. [203 Cal.Rptr. 610].)

■ Furthermore, we appreciate that there will always exist the possibility that an overzealous police officer may try to conceal an illegal entry under the cover of a simulated emergency. It would seem highly unlikely, however, that such a malevolent enterprise would be undertaken in a fashion that required the full cooperation of the Los Angeles Fire Department, as well as so many of his fellow officers. In any event, we believe our trial courts may be relied upon to ferret out the truth in such instances which, hopefully, will be of most infrequent occurrence.

If, in an individual case, a court should conclude the emergency doctrine has been employed as a subterfuge to effect an illegal entry, it may suppress any evidence flowing therefrom. In the instant case, however, the many precautions taken by Officer Villalobos and the other police and fire department officers demonstrate that they honestly and reasonably believed they were faced with an imminent danger to the public and that their actions were motivated by a desire to preserve and protect lives and property.

We entertain no doubt these officials were also anxious to apprehend those persons who had unlawfully introduced this menace into a residential neighborhood. However, dual motivation of this variety need not evoke our condemnation and, indeed, should merit our plaudits. (See *Cleaver* v. *Superior Court, supra,* 24 Cal.3d 297, 306.) Savior and investigator are not incompatible roles. In the broadest sense our peace officers are performing both functions even when engaged solely in their classic efforts to detect and prevent crime—or, at least, a criminal's past and potential future victims would so maintain.

Finally, we observe that in situations such as the present, neither the stationing of backup personnel, nor effecting entry with guns at the ready, is inconsistent with the existence of an emergency operation. It should come as no great surprise that those who would profit by the illicit manufacture and sale of drugs which so often destroy their customers' very lives, are not above adopting lethal means to protect their products from seizure and themselves from apprehension. In this regard, the observations made in *People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 27 [34 Cal.Rptr. 718], merit repetition: ". . . Our zeal to fend off encroachments upon the right of privacy must be tempered by remembrance that ours is a government of laws to preserve which we require law enforcement officers—live ones. Without becoming a police state, we may still protect the policeman's status."

The order of dismissal is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Roth, P. J., and Beach, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 25, 1987.